2001 SD 61

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**William Boyd GUTHRIE, Defendant and Appellant.**

**No. 21388.**

Supreme Court of South Dakota.

Argued Oct. 23, 2000.

Decided May 16, 2001.

Rehearing Denied June 20, 2001.

---

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

Philip R. Parent of Arneson, Issenhuth & Gienapp, Madison, for defendant and appellant.

KONENKAMP, Justice

[¶ 1.] In this appeal, we affirm the defendant's conviction for murdering his wife.

## A.

### The Drowning

[¶ 2.] At 7:00 a.m. on May 14, 1999, Dr. William B. Guthrie, a Presbyterian minister, called 911 for emergency assistance. Sharon, his wife of thirty-three years, lay naked and unconscious in the bathtub. The first persons to respond found her face down in the empty tub. Guthrie was "on his hands and knees sobbing and asking for help." Two EMTs pulled her out and moved her to a nearby hallway to perform CPR. In their efforts, they became soaked with water. After the ambulance left, Bonnie Dosch, an R.N. who had assisted in attempts to resuscitate Sharon, offered to take Guthrie to the hospital. She helped him put on his shoes and socks.

[¶ 3.] Sharon regained some heart activity in the emergency room, but never breathed on her own and never recovered any brain function. She expired on May 15, 1999, at age fifty-four. Dr. Brad Randall, a forensic pathologist, performed an autopsy the following day. Gastric and blood serum toxicology confirmed the presence of subtherapeutic amounts of two antianxiety agents, Diazepam and Lorazepam, and a sedative, Oxazepam. From the partially digested condition of the tablets, it appeared they could have been taken within four hours before her drowning. Also present was a toxic and debilitating level of Temazepam, but not a fatal overdose. The level of Temazepam in Sharon's system was enough to render her unconscious. Randall estimated that she ingested "about 20" Temazepam capsules, which could not have been taken accidentally. She drowned "because she was incapacitated from the Temazepam dose." In Randall's judgment, her death was not natural and not accidental, but from the autopsy alone he could not resolve whether it was suicide or homicide.

## B.

### The Investigation

[¶ 4.] As the incepting cause of death was medically unattended, Beadle County Chief Deputy Sheriff Jim Sheridan examined and photographed the Guthrie home after Sharon was taken to the hospital. He then took Guthrie's statement. Guthrie said that in keeping with his morning routine, he left the house for about ten minutes of prayer and devotion at his church next door. When he returned he noticed that the hallway floor was wet; he opened the bathroom door and found his wife. He tried to remove her from the tub, but she was too heavy. He drained the water and called for help. Witnesses at the scene recalled that he was not wet or that his knee only was wet. Furthermore, he had no shoes or socks on when the emergency personnel arrived, peculiar in that he said he had just arrived home from devotions at his church.

[¶ 5.] Deputy Sheridan learned that the autopsy revealed a large amount of prescription drugs in Sharon's system. He asked Jerry Lindberg of the Department of Criminal Investigation for assistance. They confirmed that Temazepam was present in the household. It had been prescribed for Guthrie as a sleeping aid. Additionally, they discovered that Guthrie had been involved with another woman. When the officers first confronted him about the affair, he denied it, but he soon conceded it was true. Sheridan later obtained a search warrant for Guthrie's home and church office. The officers seized a computer in his office on July 27, 1999.

[¶ 6.] The Guthries had three adult daughters: Suzanne, Jenalu, and Danielle. They knew their father was unhappy in the marriage. He had told Suzanne that he no longer loved Sharon and planned to obtain a divorce after Jenalu's wedding in June. For six or seven years he repeatedly told their youngest daughter, Danielle, not just that he wanted a divorce, but that he hated Sharon, that she was fat and ugly, that she so disgusted him he could not force himself to touch her.

[¶ 7.] Guthrie's adulterous affair spanned from 1994 to 1999. It began while he was serving as a pastor in Orleans, Nebraska. Despite efforts to keep it secret, rumors of his illicit relationship with a married woman who served as an elder in the church ultimately prompted his superior to suggest that it would be best for him to find another position. Guthrie denied any impropriety to both his superior and his congregation. He persisted in saying that he could not consummate a sexual act because he was impotent.[1] Nonetheless, he relocated his family to Wolsey, South Dakota, in July 1996, where he began as the pastor for the Wolsey Presbyterian Church. There, an appreciative congregation heard "the best sermons that [they] ever had." But the affair continued.

[¶ 8.] On the pretext of attending counseling or meetings, he and his paramour met in motels in Kansas and Nebraska. He had no sexual performance problems with her. Over the years, they talked "about him at some point being single," so they could be together. She eventually got a divorce. He was hesitant, though, because a divorce with revelations of an affair and his lies about it could affect his future in the ministry. Finally, she became "tired of sneaking around." In January 1999, she told him their relationship was over. It was time to start seeing other people, she said, but she left open the possibility that if he ever left Sharon, they "could date and see how it went." In the months before the drowning, Guthrie continued to talk with her on the telephone two or three times a week. They were intimate on one more occasion in late February. A week after the funeral, he tried to reconnect with her, but she declined. Rebuffed, he told her that it had not taken her long to betray him.

[¶ 9.] Several curious mishaps occurred in the months before Sharon's death. In one case, a cord had been stretched across the steps to the basement. In reporting the incident, Sharon told family members that Guthrie wanted her to come downstairs. When her foot touched the cord, she sat back on the steps. She recalled that Guthrie grabbed her shoulder to keep her from falling. Yet she told her daughter, Suzanne, "Somebody tried to kill me." Suzanne telephoned her dad. Angry that

---

1. His impotence originated, he claimed, from an incident when he was staying at a motel and "he was pushed into a room by a man and a woman truck driver [where he was] raped and sodomized and beaten."

Suzanne had learned of the incident, Guthrie said he had told Sharon not to tell anybody about it because he was going to discuss it with the sheriff. The next day, however, he told Suzanne that Sharon "had stepped on her shoelace." Suzanne's husband examined the stairs a few days later.. Two steps down he saw

> shavings like somebody had drilled a hole and there were fresh wood shavings on the carpet. On the other side of the wall it's like a concrete base, there was a round, I don't want to say hole, but there was a place where it looked like something had been glued and then pulled off, but there was actually something that appeared round there.

[¶ 10.] On another occasion, a bathroom light was not working. Guthrie brought in a lamp so Sharon could wash her hair in the bathtub. The lamp fell over. As Sharon later recounted it, she believed the dog bumped the lamp. And Guthrie was there to catch it. Indeed, Guthrie thought he received an electrical shock in the incident and went to the emergency room for treatment. Dr. Richard Reed admitted him overnight for observation, but could find no physical manifestation of electrical shock. The doctor recalled, however, that Guthrie was "extremely anxious, breathing very rapidly, nervous," and complained about "a lot of pain in various parts of his body."

[¶ 11.] Judd Robbins, a computer specialist with several degrees in Computer Science, examined the contents of the church computer's hard drive. He found that the computer had been used to conduct numerous Internet searches on subjects uncannily related to these disquieting incidents and to the drowning. Some of these searches were not connectable to any date; others could be pinpointed to specific days in the months before Sharon's death. Sharon had access to this computer, but she was not very familiar with the Internet. Her daughter had shown her twice how to use a web browser, but other than sending and receiving email, she seemed to have little interest in the Internet. In the two days before the falling lamp episode, the computer in Guthrie's church office had been used for two hours to conduct specific Internet searches using an online search engine—the repeated queries were for "household accidents" and "bathtub accidents."

[¶ 12.] On April 15, 1999, Guthrie brought Sharon to the clinic with the complaint that she could not wake up.[2] She

---

2. On the church computer's hard drive was a draft email message from Guthrie to his daughter, Jenalu, dated April 16, 1999. The text of the message is repeated here with its spelling and typographical errors.

> Hi well your mother continues to keep me on my toes even in the middle of the night. Wednesday night Tuesday evening she got up turned on all the lights walked into the kitchen was there about 15 min. and returned to bed, with a glass of chocolate milk. I asked her what she did she said nothing this was about 2:00 a.m. then about 3:00 she did the same thing. then about 4:30 she did it again this time after about ten min. I got up to check on her she passed me in the hall without acknowledging I was there. At 7:00 a.m. I woke her up for work and she wobbled into the bathroom and a few min. later she was asleep in the tub with water running all over the floor. I woke her up got her out of bed ant then started my investigation. She during the night at some point had ingested something like 15 to 20 Benadryl and God knows what else. She has been sleep walking now I figure for about 3 months and just now I'm realizing what she has been doing talk about feeling stupid. Well I got her to the Dr. and he did some tests and he feels she has the same sleep disorder her brother has. Well I put up all the meds last night where she can't find them and we got some sleep last night. She got up twice in the night and I knew then what she is doing. Well so much for that now I will

was "completely out of it." Twice he told clinic personnel, "I didn't do anything to her." The examining physician, Dr. Jeff Hanson, could find nothing wrong with Sharon. A urine toxicology screen revealed no drugs. The screen would not have revealed the presence of Benadryl, however. Guthrie told the doctor that while sleepwalking Sharon might have taken Benadryl and Codeine. Sharon could remember nothing of the incident the next day, but she believed it was her fault: she had overdosed on her allergy medication (Benadryl) and herbal diet pills. She wanted to lose weight before her daughter's wedding. Her excess weight and her husband's consequent disapproval also concerned her. She once remarked, "As soon as I lose weight, Bill is going to take me on a cruise."

[¶ 13.] During the month of April, in addition to the searches on household accidents, the church computer was also used to explore details about prescription drugs. An online search engine was engaged to look for such medications as "Lorazepam," "Ativan," "Ambien," and "TCA." Various web pages were downloaded from drug manufacturers and other sites, all describing these drugs, their purposes, and their dangers. Although the date could not be isolated, one of the searches brought up a website promoting a book entitled "Worst Pills Best Pills–A Consumer's Guide to Avoiding Drug–Induced Death or Illness." Ominously, listed among the 160 "do not use" prescriptions was a medication called Restoril (Temazepam). Pharmaceutical literature warns that this medication carries dangerous consequences if taken im-

properly. Overdosage symptoms include: somnolence; confusion with reduced or absent reflexes; respiratory depression; apnea; hypotension; impaired coordination; slurred speech; seizures; and ultimately coma and death. The last Internet drug search that month was on April 27.

[¶ 14.] Two days later, on April 29, 1999, Guthrie went to the clinic complaining of insomnia. He saw Physician Assistant Jean Thompson. They discussed sleeping medications. She suggested Ambien. He declined, saying that both Ambien and Xanax had not been effective in the past.[3] (His medical records going back ten years mentioned nothing of past sleeping problems or of any prescriptions for sleeping medications.) They agreed on Temazepam (Restoril), although Thompson had reservations about prescribing it because of its side effects. One side effect is residual drowsiness the day after the medication is taken. Guthrie received a prescription for fifteen capsules at thirty-milligram strength, with three refills. He was to take one capsule at bedtime.

[¶ 15.] Later that day, Sharon reported to Thompson that her husband said "he had lost the prescription and asked if [she] would mind calling a second one in for him." Thompson phoned the prescription in at Statz Drug. Guthrie went to K–Mart that afternoon and had one prescription filled. Two hours later, he went to Statz Drug and had the other filled. On May 4, the church computer was again used to search the Internet, this time specifically for "Temazepam." On May 12, Sharon picked up a refill at Statz Drug. The next day, the day before Sharon drowned,

---

keep you posted on the continuing saga of *How the Guthrie's churn...*
I love you Dad...
Guthrie did not mention to the doctor anything about Sharon sleeping in the tub. When he spoke to investigators, he reported

that Sharon had been sleepwalking since the mid–1970s. At trial, no family members could corroborate his claim that she sleepwalked. This email message was never sent.

**3.** After Sharon's death, Guthrie would obtain a prescription for Ambien on June 9, 1999.

Guthrie picked up yet another refill at K– Mart. Now, sixty capsules had been obtained in the period of two weeks.

[¶ 16.] One of Sharon's favorite drinks was chocolate milk. She drank it every day and usually in the morning. Because Restoril comes in capsules, their contents can be removed by simply twisting them open. The powdery substance inside is tasteless and odorless. The other sleep remedies that the Physician Assistant had discussed with Guthrie, Ambien and Xanax, come in tablet form and thus cannot be as easily dissolved. When the pathologist examined the contents of Sharon's stomach, he thought it unusual that there were no Restoril capsule remnants to be found. He did find pieces of other medications in non-toxic amounts. Law enforcement officers theorized that the contents of approximately twenty Restoril capsules had been placed in Sharon's chocolate milk before she drank it that morning. She would not have been able to detect it. After Sharon's death, a friend who came to clean the home wiped up what she thought was flour on the kitchen counter. Sharon was allergic to flour, but flour was stored in the home. There were still chocolate milk cartons in the refrigerator.

[¶ 17.] After Sharon's death, Guthrie gave conflicting accounts of the drowning. The version he reported to Deputy Sheridan is not the one Suzanne recalled her father giving. In her presence, he claimed to have gotten Sharon out of the tub himself and then called 911. Larry Provance, Sharon's brother, recalled that when he was in Guthrie's home after Sharon's death, he heard Guthrie explain the circumstances surrounding Sharon's death several times and each time the details changed. Executive Presbyter William Davis said that Guthrie told him that the night before Sharon's death, he had awak-ened around midnight because Sharon was sleepwalking. Guthrie went over to the church to work on his sermon. He returned an hour later to find water "running out of the bathroom and down the stairs." He ran up to the bathroom and found Sharon. Guthrie told Davis that he tried to resuscitate her, but he told Deputy Sheridan that he did not know CPR. Davis thought it strange also that right after Sharon's death Guthrie told him, "We were getting along great." He had previously told Davis that he wanted a divorce.

## C.

### The State's Case

[¶ 18.] Guthrie was indicted for first degree murder on August 27, 1999. Three days later, he appeared for arraignment and was ordered held without bond. He pleaded not guilty. The jury trial commenced on January 10, 2000. Whether Sharon's death was murder or suicide was the crucial issue. The State called various witnesses, including law enforcement officers, doctors, a computer specialist, the Executive Presbyter, and the three daughters. On the question of suicide, the State offered Dr. Alan Berman, a clinical psychologist, suicidologist, and the Executive Director of the American Association of Suicidology. A suicidologist, Berman explained, is an expert who through professional training and experience, studies suicidal death "primarily in terms of learning about the character of individuals who are suicidal and those that do [commit] suicide and the circumstances that surround suicidal death." Guthrie objected, arguing that Berman's theories were not scientifically validated.

[¶ 19.] Berman detailed for the jury the psychological dynamics found in those who take their own lives. Sharon Guthrie exhibited a minimum of predisposing risk factors. Although she had ingested multi-

ple drugs, a circumstance consistent with suicide, she had no history of mental illness, depression, significant physical illness, chemical dependency, or suicidal ideation. She had no personal or family background of suicidal behavior. Her husband had been having an affair, but she almost certainly had known of it for some time.[4] Guthrie later admitted on the stand that he had told her he wanted a divorce the previous January. With her knowledge of her husband's infidelity and plans for divorce, Dr. Berman believed that those circumstances could not likely be credited with triggering suicide. Berman found several contraindications for suicide risk. Sharon was excited about her daughter's upcoming wedding. With her personality and her self-consciousness about her weight, she would not have wanted to be found naked. He explained that less than 2% of women kill themselves by drowning in the bathtub, and those who do generally lie back in the water as if to sleep. Berman was permitted to go beyond reciting suicide risk factors and whether Sharon met a profile for suicidal persons. Over objection, he testified that in his opinion "Sharon Guthrie did not die by suicide." Likewise, in his report admitted into evidence, Berman stated, "It is my considered opinion to a high degree of certainty that Sharon Guthrie did not die by suicide."

## D.

### The "Suicide Note"

[¶ 20.] After the State rested, defense counsel unveiled a "suicide note." Guthrie had given it to his attorney in mid-June, some seven months earlier. Despite a reciprocal discovery order, counsel did not disclose the note because, as he explained to the judge the next day, it had been given to him "in confidence and [he] was not authorized to release it until yesterday." At the time he received it, counsel believed the document "could be as inculpatory as it was exculpatory, absent some authentication to its source. And particularly the elimination of my client as the source of the document." It did not occur to counsel to have the note examined for fingerprints until he read a newspaper article in the Madison Daily Leader in late December 1999 about Cynthia Orton's locally operated fingerprint business. Over the State's objection, the note was admitted, subject to State experts having an opportunity to examine it and a hearing following the trial on possible sanctions against defense counsel.

[¶ 21.] Guthrie took the stand for the limited purpose of explaining how he found the note. He said he discovered it in his church office on June 10, three weeks after Sharon drowned. It was "written by Sharon," he said, and placed in the liturgy book that "Sharon and I used for preparing bulletins." Guthrie told no one but his attorneys and a fellow minister in confidence. Five days after finding it, he gave it to defense counsel. He never mentioned it to his family or to law enforcement investigators. In fact, on July 26, 1999, Suzanne went to her father with a hidden tape recorder, seeking answers about her mother's death. She broached the subject of suicide, but Guthrie volunteered nothing. He appeared nervous and would not make eye contact with her. Two days later, however, he came to her workplace. He then revealed to her that "he had told my mom the evening before her death that he had told her about the affair and that

---

4. According to one of Guthrie's own exhibits, she knew of the affair while they were still living in Orleans, Nebraska.

he was going to divorce her." Sharon responded with an "anxiety attack," Guthrie said, and thus he "suspicioned" that her death the next morning was suicide. Yet Suzanne recalled telephoning her mother that same night after 10 p.m. to ask about a glue pot she left at church. Sharon was in bed at the time. She agreed to bring the glue over the next morning. Suzanne detected no stress or emotional upset in her mother's voice.

[¶ 22.] The unsigned note was dated the day before Sharon's death. It was addressed to her daughter:

May 13,1999

Dear Suzanne,

I am sorry I ruined your wedding, Your dad told me about your concerns of my Interfering in Jenalu's and the possibility I might ruin hers. I won't be there so Put your mind at ease. You will understand after the wedding is done. I love you all Mom.

(The note, replicated here with its spacing and typographical errors, was apparently created on a computer.)

[¶ 23.] Five days before trial, defense counsel hired Cynthia Orton to examine the note for fingerprints. Orton, with years of training and experience gained in the military, obtained Sharon's latent prints from some of her personal possessions. Sharon had no record prints on file. Orton testified that out of several prints made visible on the "suicide note" with the aid of the chemical Ninhydrin, she chose four "strong" prints. She could not analyze all the prints due to "time constraints." The four prints could not be attributed to Guthrie or his attorney. Yet she could neither prove nor disprove that the prints belonged to Sharon, and thus she could not say if Sharon ever touched the note. Nonetheless, she testified that because the four prints appeared to have been left by someone "very sweaty," and

sweating is commonplace for those contemplating suicide, she thought someone intending suicide handled the note. After the note was revealed to the State, an expert for the prosecution had an opportunity to analyze it. The State's expert used a different chemical "developer" to reveal prints in the oils left by persons touching the note. On the other hand, Ninhydrin, the developer Orton used, educes the alphamino acids left by perspiration. Orton testified that the physical developer used by the State examiner obliterated some of the coloration brought out by the Ninhydrin.

[¶ 24.] To prove the note was not written by Guthrie, the defense called a computer specialist who testified that in his examination of the contents of the church computer's hard drive, there were no traces of any such note ever having been created. However, prosecutors were reminded that there was a second computer. It had been in the Guthrie home. When officers had earlier examined the home in July with a search warrant, they saw the computer, but it appeared not to have been used. They decided not to take it. Guthrie had access to it until he was arrested and jailed on August 27. Sometime after his arrest, he asked his daughter and son-in-law, Suzanne and Les Hewitt, to store some of his household belongings, including this computer and the printer connected to it. Now on the revelation of a suicide note, the State asked Les Hewitt to bring in the computer. He agreed. Guthrie moved to suppress the evidence gained from this computer, asserting that it was seized illegally. The court denied the motion.

[¶ 25.] From examining the home computer's hard drive, the State's expert found a document with conspicuous similarities to the note Guthrie gave to his attorney. This document had been creat-

ed and modified on August 7, 1999. Like the document portrayed to the jury as Sharon's "suicide note," it was dated May 13. The font appeared similar, and the margin size and spacing between words appeared identical, even the lack of a space in the date between the comma and 1999. But there were also differences. The body of the note was missing; only the date and the words "I love you Mom" remained, but without the word "all" in that line. Nonetheless, based on his examination of the document's electronic background data and the similarities between the note Guthrie gave to his attorney and the document found on the home computer, the State's expert concluded that the August 7 document was the "predecessor" of the purported suicide note. According to the expert, additional lines could have been added, printed out, and the computer then turned off, and no record on the hard disk would remain of the added lines. When recalled to the stand to answer whether he created the August 7 document, Guthrie testified, "I probably did, but I don't—I don't remember it." Even so, he insisted that he did not create the "suicide note" he found on June 10. To confirm that the note existed before August 7, attorney David Gienapp from defense counsel's law firm testified that he saw the note "quite a while before" July 26, 1999.

[¶ 26.] Still another note threatening suicide was found on the home computer's hard drive with Sharon again as the purported author. It listed various grievances Sharon addressed to Guthrie. One line stated, "I'm upset that you have had an affair and have not come clean with me, I have thought of ending my life and you would have to face up to it. Believe me I known how to do it." According to the State's expert this document was created on August 11. Guthrie admitted he wrote this one, but merely as his way of working through the emotional trauma of Sharon's death, "to try to bring some reason into what had happened."

[¶ 27.] After the State's rebuttal case, Guthrie sought to recall Cynthia Orton. Although her examination was complete after she analyzed the "suicide note" for prints in early January, she thought that with added time, the prints might become more distinct, as Ninhydrin can improve the readability of prints over time. However, Orton believed the chemicals the State used obliterated or impaired any eventual improvement in readability. In an offer of proof, defense counsel represented to the court that if called on surrebuttal, Orton would testify that (1) she now had another set of latent prints fairly attributable to Sharon which could be neither matched nor excluded from the prints on the note, (2) that because of the method used by the State, the prints on the original note were stopped from developing further, and (3) the prints on the note were more distinct before the State processed it. In disallowing the offer, the circuit court ruled that this evidence would add nothing to her testimony, but would tend to disparage the State's own processing of the note, which it had a right to do.

**E.**

**Verdict and Appeal**

[¶ 28.] After two weeks of trial and five hours of deliberation, the jury found Guthrie guilty of murder in the first degree. He was sentenced to mandatory life in prison. He appeals his conviction on the following issues: (1) whether expert testimony was properly allowed on the question of suicide; (2) whether the motion for judgment of acquittal was properly denied; (3) whether the circuit court properly denied a defense motion to suppress evidence obtained during trial; (4) wheth-

er he was entitled to offer surrebuttal testimony of his fingerprint expert; (5) whether certain communications by Guthrie to his superior fell under the "clergy privilege" in SDCL 19–13–17 and whether this privilege was waived under SDCL 19–13–26; and (6) whether the circuit court properly allowed the state to play the tape-recorded conversation, have the jury read a transcript of this recording, and permit live testimony regarding the same conversation. We conclude that Issue (4) lacks sufficient merit for full discussion.[5]

## F.

### Psychological Autopsy

[¶ 29.] Dr. Berman's testimony included an account of the common factors for persons at risk for suicide, a comparison of those factors to this case, and finally an opinion that Sharon Guthrie did not commit suicide. Berman performed his psychological autopsy by reviewing various documents, including the death certificate, the coroner's report, medical records, police interviews, and grand jury testimony.[6] He also independently interviewed family members. Berman indicated that he had been previously qualified as an expert in equivocal death cases, that he was familiar with research on the common characteris-

tics or factors in suicides, and that he had published numerous articles on the subject. After a *Daubert* hearing, the court ruled that Berman's testimony was admissible.[7] Guthrie did not counter with comparable expert testimony. Instead, defense counsel called Dr. Michael McGrath, a clinical psychologist, to attack Berman's methodology. McGrath offered no opinion on Sharon's state of mind before her death.

■ [¶ 30.] Admission of expert testimony is governed by SDCL 19–15–2 (Rule 702):

> If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Trial courts retain broad discretion in ruling on the admissibility of expert opinion. *State v. Edelman*, 1999 SD 52, ¶ 4, 593 N.W.2d 419, 421 (citing *State v. Bachman*, 446 N.W.2d 271, 275 (S.D.1989)); *Zens v. Harrison*, 538 N.W.2d 794, 795 (S.D.1995) (citations omitted). Decisions to admit or deny opinion evidence will not be reversed

---

5. Issue 4 questions the trial court's order disallowing Guthrie's request to recall his fingerprint expert as a surrebuttal witness. The court ruled, after an offer of proof, that Orton had no new evidence to contribute beyond her original testimony. The judge found that her proposed testimony was not probative and may in fact mislead the jury. Evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or ... needless presentation of cumulative evidence." SDCL 19–12–3 (Rule 403). Guthrie also contends that Orton would have testified that the four prints could not be placed on the note posthumously. This is irrelevant, as the prints could not be positively attributed to the deceased in any

event. Surrebuttal is limited to proof rebutting rebuttal evidence. *See State v. Mitchell*, 491 N.W.2d 438, 447 (S.D.1992). We find no abuse of discretion.

6. Dr. Berman described a psychological autopsy as "a manner of death investigation ... akin to a physical autopsy, but clearly where the goal is to understand the probable manner of death from a perspective of method, site, and character of the decedent."

7. The trial court entered findings of fact and conclusions of law, noting that Dr. Berman had expertise in the area of suicidology, that his research methodology was acceptable and relevant, and that his testimony rested on a reliable foundation.

absent a clear showing of abuse of discretion. *State v. Logue,* 372 N.W.2d 151, 156 (S.D.1985) (citations omitted). A court's ruling on reliability receives the same deference as its decision on ultimate admissibility. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238, 252–53 (1999). When a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion. *See Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392, 414 (1996).

[¶ 31.] Guthrie contends that the circuit court erred in allowing Dr. Berman to give his theories on suicide and particularly his opinion that Sharon did not die by suicide, as it improperly went to the ultimate issue and thus invaded the province of the jury. South Dakota abolished the ultimate issue rule and replaced it with SDCL 19–15–4: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

[¶ 32.] Before admitting expert testimony, the court must address two preliminary points. First, expert opinion must be relevant to the matter in question. *See* SDCL 19–12–2. Relevance embraces "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19–12–1. To be relevant, evidence need only be probative, not conclusive. Berman's knowledge of suicidal risk factors bore on the question of Sharon's mental state before her death. His testimony was certainly relevant. Second, the opinion must assist the fact finder in understanding the evidence or deciding the issues. *See Robbins v. Buntrock,* 1996 SD 84, ¶ 8,

550 N.W.2d 422, 425; *see also Zens,* 538 N.W.2d at 795 (citations omitted). To be helpful, of course, expert opinion must offer more than something jurors can infer for themselves. Berman's knowledge of suicidal risk factors met the helpfulness standard by assisting the jurors in evaluating the perplexing circumstances of Sharon's death.

[¶ 33.] Opinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding the repeal of the ultimate issue rule. *Zens,* 538 N.W.2d at 795 (citing McCormick on Evidence § 12 (4th ed 1992)). *See also State v. Barber,* 1996 SD 96, ¶ 38, 552 N.W.2d 817, 823 (citations omitted). Although Berman was not asked to address Guthrie's guilt or innocence, his opinion approached the impermissible when he told the jury that "Sharon Guthrie did not die by suicide." *See Zens,* 538 N.W.2d at 796. It left the inference that she was murdered, or perhaps died accidentally, a far less likely deduction in view of the pathologist's conclusions. It is one thing to state that few of the factors typically found in suicide can be seen in this case. It is another thing to declare as scientific fact that based on a psychological profile the death was not suicide. One assists the jury, but allows it to draw its own inferences from the psychological knowledge imparted. The other simply tells the jury what inference to draw. However, we need not decide if Dr. Berman's final opinion was impermissibly intrusive because it was inadmissible under the *Daubert* standard. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[¶ 34.] Under *Daubert,* the proponent offering expert testimony must show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge under SDCL 19–15–2

(Rule 702). This burden is met by establishing that there has been adequate empirical proof of the validity of the theory or method. Edward J. Imwinkelried, Evidentiary Foundations 287 (4th ed 1998). In deciding whether to admit expert testimony, a court must ensure that the opinion abides on a reliable foundation. *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799, 125 L.Ed.2d at 485. The standards set forth in *Daubert* are not limited to what has traditionally been perceived as scientific evidence. These standards must be satisfied whenever scientific, technical, or other specialized knowledge is offered. *Kumho,* 526 U.S. at 141, 119 S.Ct. at 1171, 143 L.Ed.2d at 246. Guthrie does not challenge the relevance of this testimony; he contends only that Berman's opinion does not rest on a reliable foundation.[8]

■ [¶ 35.] A trial court can consider the following nonexclusive guidelines for assessing an expert's methodology: (1) whether the method is testable or falsifiable; (2) whether the method was subjected to peer review; (3) the known or potential error rate; (4) whether standards exist to control procedures for the method; (5) whether the method is generally accepted; (6) the relationship of the technique to methods that have been established as reliable; (7) the qualifications of the expert; and (8) the non-judicial uses to which the method has been put. *See Daubert,* 509 U.S. at 593–95, 113 S.Ct. at 2796–98, 125 L.Ed.2d at 483–84. *Daubert's* list of factors may not each apply to all experts in every case. *Rogen v. Monson,* 2000 SD

51, ¶ 28, 609 N.W.2d 456, 462–63 (Konenkamp, J. concurring) (citing *Kumho,* 526 U.S. at 141, 119 S.Ct. at 1171, 143 L.Ed.2d 238).

■ [¶ 36.] Guthrie's argument centers on contradictory testimony about whether psychological autopsies have been subject to validity studies. Of course, the law does not require opinion testimony to be above all criticism before it is admissible. Guthrie's expert testified that there were no validity studies in the area. We interpret our rules of evidence liberally with the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert,* 509 U.S. at 588, 113 S.Ct. at 2794, 125 L.Ed.2d at 480 (citations omitted). *See also* SDCL 19–9–2. The type of studies Berman used were on "reliability," which assesses whether a group will reach the same conclusion given the same criteria. On the other hand, a validity study determines whether the conclusion reached is correct. Thus, Guthrie insists that the methodology was not reliable. The law endows the trial court with "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho,* 526 U.S. at 142, 119 S.Ct. at 1171, 143 L.Ed.2d at 246 (italics in original). As a result, *Daubert* and *Kumho* provide "a fundamentally deferential analysis, leaving little reweighing in the appellate court." 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4–27 (3d ed 1999). Generally, an expert's opinion is

---

8. Guthrie asserted that Berman's report was objectionable as it contained misstatements of fact and evidence not produced. Whatever inconsistencies there were went to the weight the jury may have given to the report, not to its admissibility. *See Estate of Dokken,* 2000 SD 9, ¶ 41, 604 N.W.2d 487, 499 (citations omitted). Guthrie points to an opinion in Berman's report stating that Sharon would not likely have committed suicide in a manner where she would be found naked. Berman attributes this information to an interview he conducted. The factual basis for an expert opinion is given wide latitude. Under SDCL 19–15–3, experts may base their opinions on facts perceived by or made known to them at or before the hearing, if of a type reasonably relied on by experts in the field in forming opinions, and the facts or data need not be admissible in evidence.

reliable if it is derived from the foundations of science rather than subjective belief. *Daubert,* 509 U.S. at 589–90, 113 S.Ct. at 2795, 125 L.Ed.2d at 480–81.

■ [¶ 37.] The *Daubert – Kumho* factors are guides, not inflexible benchmarks. *Rogen,* 2000 SD 51, ¶ 28, 609 N.W.2d at 462–63 (Konenkamp, J. concurring) (citations omitted). Nonetheless, as the Supreme Court recognized in *Daubert* and again in *Kumho,* the ability to validate a hypothesis lies at the core of a trial court's inquiry. In *Kumho* the Court "openly extended *Daubert* to non-scientific areas such as engineering, and its reasoning would seem to apply to social sciences as well." Childress & Davis, *supra,* § 4.02, at 4–27. Considering Berman's credentials and methodology, allowing the jury the benefit of his psychological knowledge and experience on typical characteristics or profiles of suicidal persons is within the permissible bounds of expert testimony. These characteristics gave the jury valuable insights into the state of the mind of persons contemplating suicide. The circuit court could reasonably find that "relevant reliability concerns" focused on Berman's "personal knowledge [and] experience." *See Kumho,* 526 U.S. at 150, 119 S.Ct. at 1175, 143 L.Ed.2d at 251.

■ [¶ 38.] When opposing experts give contradictory opinions on the reliability or validity of a conclusion, the issue of reliability becomes a question for the jury.

*See State v. Hofer,* 512 N.W.2d 482, 484 (S.D.1994). The trial process is well equipped to deal with contradictory opinions. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798, 125 L.Ed.2d at 484 (citations omitted). Guthrie fiercely challenged the accuracy of Berman's methods with expert opinion from another psychologist. He chose to offer this type of testimony rather than expertise on suicide. Consequently, we conclude that the trial court ruled correctly on the reliability question, leaving for the jury to decide whether Berman's testimony on the typical characteristics of suicidal persons deserved factual acceptance. *See Hofer,* 512 N.W.2d at 484.

[¶ 39.] On the other hand, when Dr. Berman's testimony moved from imparting typical characteristics and whether Sharon met a suicidal profile to declaring that based on her profile she did not commit suicide, we face a more difficult question. What empirical proof is there that because certain deceased persons in equivocal death cases bore only a few characteristics of a suicidal profile, that therefore they can be declared to have not committed suicide? What studies exist on error rates and falsifiability for such opinions? Berman provided little data.[9] We think there

---

9. Dr. Berman testified that he authored or co-authored eighty publications "most of which are research articles in peer review journals which are essentially studies of suicidal people relative to non-suicidal people." Nonetheless, only two of those articles dealt with psychological autopsies: one was published in 1986 and discussed the impact of such autopsies on medical examiners who determine the manner of death; the other one was published in 1989 and dealt with the operational criteria for the classification of suicide. In the *Daubert* hearing, he cited two other studies he did not author, but neither of these dealt with the predictive validity or reliability of psychological autopsies in suspected homicide cases. In truth, psychological autopsies are a "relatively new, unrefined, and un-researched clinical technique...." "[I]t is difficult to identify another area of law where psychological and psychiatric testimony with such little empirical foundation or support, and with such little acceptance by the field, is admitted as evidence." "Given the dearth of research investigating the validity and relia-

is substantial reason to doubt the reliability of suicidal profiles if they are to be used to declare unequivocally that a subject's death was self-inflicted. This testimony has the same pitfalls as syndrome evidence. We have been cautious in authorizing definitive opinions based on psychological syndromes.

[¶ 40.] In the present state of behavioral science research, a syndrome may be generally reliable to describe and explain functions and characteristics, but it is not dependable to prove that the syndrome itself establishes the ultimate issue.[10] *See generally Edelman,* 1999 SD 52, ¶ 17, 593 N.W.2d at 423 and the cases collected there. In *State v. Burtzlaff,* 493 N.W.2d 1, 4 (S.D.1992), we upheld the trial court's order disallowing a retrospective assessment of the deceased victim's psychological profile and likewise affirmed the court's refusal to allow expert opinion that the defendant suffered from battered woman syndrome. However, we did cite cases in *Burtzlaff* approving psychological autopsies when "the victim's state of mind was relevant, such as suicide victims (*Jackson v. State,* 553 So.2d 719 (Fla.App.,4 Dist. 1989); *Thompson v. Mayes,* 707 S.W.2d 951 (Tex.Ct.App.–Eastland 1986)) and

where the murder defense was suicide (*Bartram v. State,* 33 Md.App. 115, 364 A.2d 1119 (1976))." *Id.* at 5.. Nonetheless, *Daubert* was decided a year after *Burtzlaff,* and our standards have since been modified. Not only are these cases all pre-*Daubert,* but also they provide no assistance to our case in any event. In *Jackson,* for example, the question was not whether the victim committed suicide, but why she committed suicide. More helpful, though still pre-*Daubert,* is *Beaver v. Hamby,* 587 F.Supp. 88 (M.D.Tenn.1983), a federal habeas corpus proceeding. Although it allowed psychiatric autopsy expert opinion, the testimony was confined to an examination of the victim's suicidal tendencies.[11] *Id.* at 91.

[¶ 41.] A few courts have allowed psychological autopsy evidence in cases where the question before the jury in a homicide prosecution was whether the deceased died from suicide. In those cases, however, the experts did not opine with scientific certitude that the deceased did or did not commit suicide. In *United States v. St. Jean,* 1995 WL 106960 *2, a case of a husband accused of murdering his wife, an expert testified that the circumstances of

bility of psychological autopsies, there is good reason to be cautious about introducing expert testimony about psychological autopsies in legal proceedings." James R.P. Ogloff and Randy K. Otto, *Psychological Autopsy: Clinical and Legal Perspectives,* 37 St.Louis ULJ 607, 620, 645–46 (1993). *See also* James T. Richardson, et al., *The Problems of Applying Daubert to Psychological Syndrome Evidence,* 79 Judicature 10–11 (July–August 1995).

**10.** One exception is "battered child syndrome," which now has wide empirical support and receives routine acceptance in court. *See State v. Wilcox,* 441 N.W.2d 209 (S.D. 1989); *State v. Svihl,* 490 N.W.2d 269, 275 (S.D.1992)(Henderson, J., dissenting).

**11.** No case applying the *Daubert–Kumho* standards allows giving an opinion like the one

Dr. Berman gave here. The cases the concurrence in result cites provide no support: Three were decided before *Daubert,* and two others do not cite *Daubert.* Three cases are workers' compensation appeals, which does not make them unhelpful for that reason, but they involved known suicides and the question was whether the deaths were work related, not whether a psychological autopsy can reliably determine whether a death resulted from suicide. Another case was a will contest involving the question of undue influence, not whether a death was suicide or homicide. One case, Terrell State Hospital v. Ashworth, has nothing remotely to do with the question before us. It was a ca'ᵉ dealing with whether a hospital waived its committee privilege with regard to a "psychological autopsy" performed after a patient committed suicide while staying in the state hospital.

the wife's death bore none of the indicators associated with those who, commit suicide. *St. Jean* applied *Daubert* and concluded that the psychologist's testimony was reliable and thus admissible under the military rules of evidence equivalent to the federal rules. However, the psychologist's testimony was limited to "the profile of one who is, psychiatrically speaking, suicidal or a suicidal risk." *Id.* at *1. In *Horinek v. State*, 977 S.W.2d 696, 701 (Tex.Ct.App.–Fort Worth1998), a case of a police officer charged with murdering his wife, a forensic pathologist-psychiatrist performed a "psychological autopsy" and then testified "that it appeared very unlikely that this individual would be the sort of person to kill herself." But the *Horinek* court did not discuss the *Daubert* reliability standards. *See generally* Elizabeth Biffl, Psychological Autopsies: Do They Belong in the Courtroom? 24 Am.J.Crim.L. 123 (1996).

[¶ 42.] Unquestionably, Dr. Berman had special expertise on the mental states of those who commit suicide, but his knowledge was based primarily on observation and experience, not traditional empirical studies. *See* SDCL 19–15–2 (Rule 702) (experts with "specialized knowledge" may testify in the form of an opinion). In allowing experts with specialized knowledge to testify, courts applying *Daubert* generally permit these experts to describe the symptoms or behaviors of known victims, report the symptoms or behaviors observed in the victim in the present case, and give an opinion that the victim's symptoms or behaviors are "consistent with" those of known victims. *Isely v. Capuchin Province*, 877 F.Supp. 1055, 1067 (E.D.Mich.1995) (PTSD symptoms); *Gier v. Educational Serv. Unit No. 16*, 845 F.Supp. 1342, 1353 (D.Neb.1994), *aff'd*, 66 F.3d 940 (8thCir.1995) (behaviors of abused child); *State v. Alberico*, 116 N.M.

156, 861 P.2d 192, 210 (N.M.1993) (behaviors consistent with sexual abuse); *State v. Kinney*, 762 A.2d 833, 844 (Vt.2000) (characteristics and conduct of victims of rape trauma syndrome); *Carnahan v. State*, 681 N.E.2d 1164 (Ind.App.1997) (battered woman syndrome behaviors offered for limited purpose, not for proof that defendant battered victim). Berman's understanding of risk factors for suicide was relevant, helpful, and admissible, but in the present state of psychological knowledge, a suicide profile alone cannot be used to declare with scientific certainty that a person did or did not commit suicide. Berman's opinion in that respect was inadmissible under the *Daubert* standards. Thus, the trial court abused its discretion in allowing Berman's opinion that Sharon did not commit suicide. Our inquiry does not end here.

[¶ 43.] Because we find that Dr. Berman was allowed to go beyond permissible opinion testimony under *Daubert*, we must decide if admitting his opinion that the death was not suicide was harmless error. *See State v. Hart*, 1996 SD 17, ¶ 17, 544 N.W.2d 206, 210. *See also* SDCL 23A–44–14. Error is harmless when "the jury verdict would not have been different if the [challenged testimony] were excluded[.]" *See Hart*, 1996 SD 17, ¶ 17, 544 N.W.2d at 210. The State bears the burden of proving the error was not prejudicial. *State v. Nelson*, 1998 SD 124, ¶ 7, 587 N.W.2d 439, 443 (citations omitted). Although Berman's testimony was not properly limited to suicidal profiles or characteristics, the jury could have easily reasoned purely from his profiles and characteristics testimony that Sharon's death was not the result of a suicide based on the absence of sufficient suicidal indicators and the totality of the evidence offered at trial. Certainly, his opinion that Sharon did not die by suicide was not

offered as a substitute for a thorough criminal investigation. The jury had the benefit of substantial and independent circumstantial evidence from which to conclude that Sharon's death was a homicide. As such, we cannot say that in the absence of Dr. Berman's opinion on suicide the jury verdict would have been different. *See* *Hart*, 1996 SD 17, ¶ 17, 544 N.W.2d at 210. Allowing the opinion was therefore harmless error.

### G.

### Motion for Judgment of Acquittal

 [¶ 44.] Guthrie contends that the circuit court erred in not granting his motion for judgment of acquittal. Defense counsel first made this motion at the end of the State's case in chief, asserting that the State had failed to establish a prima facie case. He renewed the motion at the close of all the evidence. The State resisted without argument. In both instances, the circuit court denied the motion.

[¶ 45.] Guthrie believes that since the State relied solely on circumstantial evidence to prove its case, the evidence must be "entirely consistent with defendant's guilt and wholly inconsistent with any rational hypothesis of innocence and so convincing as to exclude a reasonable doubt that defendant was guilty of the offense charged." He contends that the State did not meet this burden; thus, the evidence was not sufficient to sustain a conviction for murder in the first degree. The State argues that Guthrie's motions were inadequate to preserve this issue for appeal.

 [¶ 46.] The rules of criminal procedure aim to achieve just determinations in criminal cases. *See* SDCL 23A–1–2. Patterned after Federal Rule of Criminal Procedure 29(a), the motion for judgment of acquittal replaced the former motion for directed verdict. *See* SDCL 23A–23–1; FedRCrimPro 29(a). A challenge to the sufficiency of the evidence being the only ground for the motion, the basis for a Rule 29(a) motion "need not be stated with specificity." 26 Moore's Federal Practice § 629.03[1] at 629–10 (3d ed and Supp 2000) (citations omitted); *see also United States v. Gjurashaj*, 706 F.2d 395, 399 (2dCir.1983) (citations omitted); *United States v. Cox*, 593 F.2d 46, 48 (6thCir.1979) (citations omitted). It is satisfactory to state, "the evidence is insufficient to sustain a conviction." 26 Moore's Federal Practice § 629.03[1] at 629–10. If the defendant makes the motion without describing the grounds with specificity, both the court and the prosecutor can request further explanation. *See United States v. Jones*, 174 F.2d 746, 748 (7thCir.1949). The defense motion clearly allowed the circuit court to address the matter, and thus we conclude the issue was sufficiently preserved for appeal.[12]

 [¶ 47.] In reviewing a circuit court's decision to deny a motion for judgment of acquittal, we inquire whether the State presented sufficient evidence on which the jury could reasonably find the defendant guilty of the crime charged. *Edelman*, 1999 SD 52, ¶ 4, 593 N.W.2d at 421(citations omitted). More specifically, we ask if there was sufficient evidence in the record that, if believed, would be adequate to sustain a conviction beyond a reasonable doubt. *Id.* In a sufficiency challenge, we will set aside a jury verdict

---

12. There are cases in South Dakota holding that a defendant's motion for directed verdict of acquittal are inadequately preserved when a defendant fails to "particularize the claimed deficiency or failure of proof." *State v. Jerke*, 73 S.D. 64, 38 N.W.2d 874, 877 (1949) (citations omitted). These cases, however, were decided before South Dakota's adoption of the present SDCL 23A–23–1 and SDCL 23A–1–2. *See* SL 1978, ch. 178, § 297.

only when "the evidence and the reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt." *State v. Hage*, 532 N.W.2d 406, 410 (S.D. 1995) (citations omitted); *State v. Lewandowski*, 463 N.W.2d 341, 343–44 (S.D. 1990). We will not resolve conflicts in the testimony, pass on the credibility of witnesses, or weigh the evidence. *Hage*, 532 N.W.2d at 410–411 (citations omitted).

[¶ 48.] All elements of a crime, including intent and premeditation, may be established circumstantially.[13] *See State v. Holzer*, 2000 SD 75, ¶ 15, 611 N.W.2d 647, 651. In some instances, convictions based on circumstantial evidence can be more reliable than those based on only direct evidence. *Hage*, 532 N.W.2d at 411 (citations omitted). Guthrie relies on language from *State v. Best*, 89 S.D. 227, 232 N.W.2d 447, 457 (1975). In later cases, however, this Court rephrased the rule on convictions based solely on circumstantial evidence. In *State v. Eagle Star*, 1996 SD 143, ¶ 16, 558 N.W.2d 70, 73, we explained:

> When the State's case rests substantially or entirely on circumstantial evidence, the trial court must instruct the jury the defendant cannot be convicted unless (1) the proved circumstances are not only consistent with the guilt of the accused, but cannot be reconciled with any other rational conclusion and (2) each fact which is essential to a complete set of circumstances necessary to establish the accused's guilt has been proven beyond a reasonable doubt.

1996 SD 143, ¶ 11, 558 N.W.2d at 73 (citations omitted).

[¶ 49.] Guthrie centers his argument on evidence supporting his theory that Sharon took her own life. He points out that her own medications were found in her stomach. At trial, he offered proof that the presence of these prescriptions could only be explained by recent consumption. He argued that Sharon had told a friend that she had trouble sleeping. As further proof of her state of mind, he offered evidence that she had cashed out her retirement account at the clinic where she worked to buy her youngest daughter a car. Guthrie challenges the State's failure to explain how he "administered [the drugs] surreptitiously." To support a conviction on circumstantial evidence, the State is not required "to exclude every hypothesis of innocence." *State v. Ashley*, 459 N.W.2d 828, 832 (S.D.1990) (citations omitted). Rather, we view the evidence cumulatively to see whether in its totality it is enough to rule out any reasonable hypothesis of innocence. *Hage*, 532 N.W.2d at 411. In making this review, we must accept the evidence with its most reasonable inferences. *Id.* at 410.

[¶ 50.] Facts alone often have equivocal significance. Details take meaning in context with other details. Here, the import of so many details depends for significance on Guthrie's credibility. If the "suicide note" is authentic, for example, that may create reasonable doubt. But what is the magnitude of the evidence that he typed two such notes himself, naming his dead wife as the author? On another point, Guthrie told the jury that he obtained the Restoril for Sharon, and he had no knowledge she later asked that a second prescription be called in. Yet, according to the Physician Assistant, Guthrie claimed he was having sleeping problems. Indeed, it was Guthrie who picked up three of the four prescriptions. Although in a circumstantial case it is a trial court's

---

13. Murder in the first degree is "Homicide . . . perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being. . . ." SDCL 22–16–4.

duty on a motion for judgment of acquittal to examine the facts for a reasonable hypothesis of innocence, when credibility gives meaning and color to so many facts, judges cannot scramble the complex circumstances to see if they might resituate to prove a more advantageous theory by dispensing with the credibility factor. Leaving to the jury the pervasive issue of credibility and considering the evidence as a whole, we think the trial court properly denied the motion for acquittal.

## H.

### Seizure of Home Computer

[¶ 51.] The trial court admitted evidence obtained from the home computer, not taken in July 1999 when the original search warrant was executed, but obtained during the trial nearly six months later. The time for execution of the original warrant had expired under SDCL 23A–35–4.[14] Thus, Guthrie contends the seizure was without a search warrant and the resulting evidence was suppressible as a violation of his right against unreasonable search and seizure. The State asserts that the seizure was authorized under the original warrant or in the alternative that an exception to the warrant requirement applied.

[¶ 52.] The Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota Constitution forbid unreasonable searches and seizures. For a search or seizure to be considered reasonable, a warrant is generally necessary. *South Dakota v. Hanson*, 1999 SD 9, ¶ 22, 588 N.W.2d 885, 891 (citations omitted). On the other hand, the requirement that a warrant be executed within ten days is not a constitutional command. *State v. Miller*, 429 N.W.2d 26, 34 (S.D.1988) (*writ of habeas corpus granted on other grounds, then reversed* ). It is purely statutory. *Id.* (citing *People v. Crispell*, 110 A.D.2d 926, 487 N.Y.S.2d 174 (1985)). Evidence obtained in violation of a criminal statute is not automatically subject to suppression. *Miller*, 429 N.W.2d at 34 (citations omitted); *see also Commonwealth v. Grimshaw*, 413 Mass. 73, 595 N.E.2d 302, 305 (1992). Such evidence may be suppressed, however, where the violation is substantial. *Grimshaw*, 595 N.E.2d at 305 (citations omitted).

[¶ 53.] The purpose of the ten day rule is "to ensure that probable cause still exists to believe that the items sought by the warrant are in the place to be searched." *Miller*, 429 N.W.2d at 34 (citing *People v. Kibblewhite*, 178 Cal.App.3d 783, 224 Cal.Rptr. 48, 49 (1986)). The rule ensures that a warrant does not become stale. In analyzing whether a warrant executed outside the statutory period was stale, "[t]imeliness of execution should not be determined by means of a mechanical test. . . ." *State v. Swift*, 251 Neb. 204, 556 N.W.2d 243, 249 (1996); *compare Spera v. State*, 467 So.2d 329, 330 (Fla.App. 2 Dist. 1985) (applying a *per se* rule that warrants executed outside the ten-day rule are invalid). Staleness should be "measured in terms of whether probable cause still existed at the time the warrant was executed." *Swift*, 556 N.W.2d at 249.

[¶ 54.] In *Miller*, this Court addressed a search that took place after the expiration of the ten-day period, indicating that since probable cause was still present the evidence found was not subject to suppression. *See* 429 N.W.2d at 34–35. Our

---

**14.** This statute provides that a warrant "shall command the officer to search, within a specified period of time not to exceed ten days, the person or place named for the property specified." SDCL 23A–35–4.

case is distinguishable from *Miller.* The seizure of the home computer took place nearly six months after the search warrant for the Guthrie household had been issued. Even applying a flexible standard, such a long gap in time requires a new showing of probable cause. If warrants can be executed at leisure, judicial control over them would deteriorate. *Swift,* 556 N.W.2d at 249. The seizure in January cannot be upheld with use of the July search warrant.

[¶ 55.] While a warrant is the preferred method for conducting a search or seizure, there are exceptions to the warrant requirement. *State v. Fountain,* 534 N.W.2d 859, 863 (S.D.1995) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 858 (1973)). One exception dispenses with the necessity of a warrant when voluntary consent is obtained from the owner or a third person "who possesses common authority over the premises." *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148, 156 (1990) (citations omitted). This applies to third persons having common authority over "effects sought to be inspected." *Fountain,* 534 N.W.2d at 865 (citing *State v. Tapio,* 459 N.W.2d 406, 414 (S.D.1990)). *See also State v. Benallie,* 1997 SD 118, ¶ 11, 570 N.W.2d 236, 238 (citations omitted).

[¶ 56.] The existence of valid consent to search is a question of fact, so we apply a clearly erroneous standard of review. *Benallie,* 1997 SD 118, ¶ 10, 570 N.W.2d at 238 (citations omitted). On the other hand, "[w]hether police had a lawful basis to conduct a warrantless search is reviewed as a question of law." *State v. Hirning,* 1999 SD 53, ¶ 8, 592 N.W.2d 600, 603 (citations omitted). Consequently, in deciding whether a third party had the authority to give consent, we are presented with a mixed question of law and fact,

reviewable *de novo. See generally State v. Gesinger,* 1997 SD 6, ¶ 7, 559 N.W.2d 549, 550.

[¶ 57.] In deciding if common control exists over a particular item, a proprietary interest alone is not dispositive. *United States v. Matlock,* 415 U.S. 164, 171, n.7, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974). The existence of common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes. . . ." *Id.* Common authority over personal property may exist when one allows another to use the property and leaves it at that person's home. *Id.* at 170–71, 94 S.Ct. at 993, 39 L.Ed.2d at 249 (discussing *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969)). By leaving possessions in someone else's custody, the entrusting party assumes the risk that the third party will consent to a search. *Matlock,* 415 U.S. at 171, 94 S.Ct. at 993, 39 L.Ed.2d at 249.

[¶ 58.] The State has the burden of proving consent by clear and convincing evidence. *Fountain,* 534 N.W.2d at 863 (citations omitted). There is no question that Les Hewitt, Guthrie's son-in-law, consented to the seizure of this computer. Hewitt voluntarily brought the computer to law enforcement officials. The question we must resolve is whether Hewitt, as a third party, had common authority over Guthrie's personal property, thus enabling him to give a valid third-party consent. We find that Hewitt possessed such common authority.

[¶ 59.] In *Fountain* this Court addressed a similar question. Fountain was arrested at the residence of a woman with whom he was staying. 534 N.W.2d at 861–62. After Fountain was taken to jail, the woman consented to a search of her home. *Id.* at 862. During the search, law en-

forcement officers found a jacket belonging to Fountain. He claimed that because his jacket was searched after he had been taken to jail, the search was invalid. We held, "[a] defendant is not automatically entitled to expect that the contents of articles left behind at another premises will remain private and, should he leave such articles behind, he assumes the risk that the other person may consent to a search." *Id.* at 866 (string citation omitted). Guthrie attempts to distinguish *Fountain*, claiming he did not voluntarily leave the computer with the Hewitts as he was forced to move out of his home and was in custody. It is noteworthy, however, that some of Guthrie's other possessions were placed in a storage unit, but he chose to have the computer stored at the Hewitt home. Hewitt had unconditional access and control over it, and as such, we conclude that he could validly consent to its search and seizure. *See Matlock*, 415 U.S. at 171, n. 7, 94 S.Ct. at 993, 39 L.Ed.2d at 250.

## I.

### Clergy Privilege

[¶ 60.] The State offered videotaped testimony from William Davis, the Executive Presbyter for Central Nebraska.[15] He testified about the conversations he had with Guthrie both before and after Sharon's death. Guthrie invoked the clergy privilege in SDCL 19–13–17. Finding that the privilege indeed existed, the trial court nonetheless ruled that Guthrie waived the privilege in later communications with third parties.

▬▬▬ [¶ 61.] The clergy privilege is defined in SDCL 19–13–16 and 17. Because the application of a statute to particular facts involves a question of law, we review the circuit court's conclusions de novo. *Lucero v. VanWie*, 1999 SD 109, ¶ 6, 598 N.W.2d 893, 895 (citations omitted). Findings of fact made as part of a ruling on the privilege are reviewed under a clearly erroneous standard. *See State v. Sleep*, 1999 SD 19, ¶ 6, 590 N.W.2d 235, 237. SDCL 19–13–17 grants persons the privilege to prevent disclosure of (1) confidential communications, (2) made to clerics, (3) in their professional capacity as spiritual advisors. Guthrie carries the burden to prove his entitlement to assert the privilege. *See State v. Catch the Bear*, 352 N.W.2d 640, 645 (S.D.1984) (citations omitted). We construe statutory privileges strictly "to avoid suppressing otherwise competent evidence." *Id.* at 646–47 (citations omitted). Not every communication to a cleric is protected by the clergy privilege. Scott N. Stone and Robert K. Taylor, 2 Testimonial Privileges, § 6.09 at 6–19 (2d ed 1995).

[¶ 62.] "A communication is 'confidential' if made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication." SDCL 19–13–16. By the language of the statute, our inquiry begins with a person's intent in communicating with a clergy member. *See Hofer*, 512 N.W.2d at 485. The circuit court heard testimony from Guthrie that he intended his conversations with William Davis to be in "confidence" as communications with his minister. Davis himself corroborated this in his testimony:

Q: Would it be fair to say that in your mind [Guthrie] was coming to you as his minister to talk to you about various matters?

A: I would say so.

---

**15.** An "Executive Presbyter" is the Presbyterian Church's designate minister who oversees churches within a specified geographical area. The Executive Presbyter acts as a support person for these churches and their ministers.

Q: Talking to you in confidence?

A: Yes.

We cannot say that the court was mistaken in its finding that Guthrie intended his conversations to remain in confidence. *See State v. Almond*, 511 N.W.2d 572, 573–74 (S.D.1994). Davis was obviously a clergy person. "A clergyman is a minister, priest, rabbi, accredited Christian Science practitioner, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him." SDCL 19–13–16.

[¶ 63.] Guthrie explained in a motion hearing that William Davis was his Executive Presbyter when he was a pastor in Nebraska. An Executive Presbyter functions as a pastor to pastors. Guthrie indicated that his conversations with Davis concerning his relationship with Sharon were imparted to Davis in his capacity as a minister. The State disputes this, focusing on the fact that Davis was no longer Guthrie's superior after Guthrie moved to South Dakota. Simply because Davis was no longer Guthrie's superior, it does not logically follow that Guthrie did not "reasonably believe" that Davis could still serve as his minister.

[¶ 64.] The most difficult inquiry under SDCL 19–13–17 is deciding whether, in each of these conversations, Guthrie's communications with Davis were in Davis's "professional character as spiritual advisor." *See* SDCL 19–13–17. Such a requirement is common among state privilege statutes. *See* Stone and Taylor, 2 Testimonial Privileges, § 6.12 at 6–26. In interpreting a similar statutory requirement, a Minnesota court explained that the communication need not be in the form of a confession.[16] When a conversation takes place in a time of family crisis, the communication is likely for the purpose of seeking religious or spiritual advice. *State v. Orfi*, 511 N.W.2d 464, 470 (Minn.Ct.App.1994).

[¶ 65.] In deciding if a communication was made to a cleric acting in a professional capacity as a spiritual advisor, other factors may be considered. For example, "the fact that the communication was initiated by the clergyman rather than the penitent [may be] viewed as significant." Stone and Taylor, *supra* § 6.12 at 6–27 (citations omitted). Similarly, the specific relationship between the communicants may be relevant. *See e.g. Bonds v. State*, 310 Ark. 541, 837 S.W.2d 881, 884 (1992) (minister acting as employer). Our inquiry must be founded on the particulars of each case. *Magar v. State*, 308 Ark. 380, 826 S.W.2d 221, 223 (1992) (citing *United States v. Gordon*, 493 F.Supp. 822 (N.D.N.Y.1980)) (further citations omitted).

[¶ 66.] The substance of Davis's testimony can be summarized as follows: (1) communications between Guthrie and Davis regarding an incident where Guthrie was allegedly sexually assaulted, (2) communications where Davis asked Guthrie whether he was having an affair, and (3) the conversation with Guthrie when Davis called him to offer his condolences after Sharon's death. In light of the foregoing considerations, only the conversation regarding the alleged sexual assault on Guthrie was privileged, as the circuit court found. Davis explained that before this conversation, Guthrie indicated he wanted to share something, but was not ready to discuss it. A few months later, Guthrie told Davis that he was sexually assaulted on a trip to Lincoln, Nebraska, and that it

16. The Minnesota statute required that the communication was for the purpose of seeking "religious or spiritual advice, aid, or comfort...." *State v. Orfi*, 511 N.W.2d 464, 469 (Minn.Ct.App.1994) (citing Minn.Stat. § 595.02(1)(c)).

was "affecting all aspects of his life." Davis suggested that he seek counseling.

[¶ 67.] On the other hand, the conversations about Guthrie's affair and about Sharon's death were not made to Davis as a spiritual advisor. We agree with the Minnesota court that to be classified as privileged such statements need not be a confession. Other factors, however, militate against interpreting these statements as privileged. Davis made clear that he initiated the communications about Guthrie's affair. *See Bonds,* 837 S.W.2d at 883–84 (conversation accusatory in nature). His inquiry was made in his capacity as a superior as indicated in the following exchange:

Q: After this conversation with him did that satisfy you and keep his position at the church?

A: Yes, I fully believed [Guthrie]. I had no reason to doubt his integrity, he had not shown previously that I should have reason to doubt his integrity.

Consequently, we conclude Davis's testimony about the affair was outside the clergy privilege.

[¶ 68.] After the Guthries moved to South Dakota, Davis had much less contact with him. He spoke to Guthrie once during the first six months he was in Wolsey. Davis was informed of Sharon's death from another source and then called Guthrie to offer his condolences. During this conversation, Guthrie described the circumstances surrounding the death. Although Davis had counseled him in the past, they rarely spoke after Guthrie became established in South Dakota. *See Magar,* 826 S.W.2d at 223 (notwithstanding past counseling the subject communication was not confidential when minister had not counseled defendant in several months). Furthermore, this conversation was initiated by Davis who called to offer

his regrets as any other family friend might do. In light of these facts, Guthrie's description of the circumstances surrounding Sharon's death was not privileged.

[¶ 69.] As Guthrie's statements to Davis about the alleged sexual assault were privileged under SDCL 19–13–17, we must decide whether Guthrie waived the privilege. Our statutory scheme grants particular privileges and provides for the voluntary waiver of those privileges:

A person upon whom this chapter confers a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This section does not apply if the disclosure itself is privileged.

SDCL 19–13–26. The circuit court found that Guthrie had waived his clergy privilege by voluntarily disclosing the privileged information to third persons, relying primarily on our decisions in *State v. Karlen* and *State v. Catch the Bear.* 1999 SD 12, 589 N.W.2d 594; 352 N.W.2d 640.

[¶ 70.] Guthrie argues that the circuit court erred in admitting his conversations with Davis under the *Karlen* standard. He summarizes his argument by explaining, "the person asserting the privilege [must tell] non-privileged parties 'I had this confidential communication with a counselor and this is what I [said].'" Such an interpretation is at odds with SDCL 19–13–26 and precedent. Under SDCL 19–13–26, voluntary disclosure of *"the contents* of the communication to a third party" constitutes a waiver of the privilege. *Karlen,* 1999 SD 12, ¶ 33, 589 N.W.2d at 601 (citations omitted) (emphasis added).

[¶ 71.] In *Karlen,* two justices advanced the concern that "[m]ere conversation regarding the same incident ... [should] not constitute a privilege waiver."

*Karlen,* 1999 SD 12, ¶ 60, 589 N.W.2d at 607 (Miller, C.J., dissenting). This does not, however, implicitly suggest that waiver requires disclosure of the contents of a privileged communication plus disclosure that the holder previously had a privileged conversation. Instead, this language indicated that the disclosure of the privileged information must be more precise than simply conversations regarding the same subject matter. *See Karlen,* 1999 SD 12, ¶ 60, 589 N.W.2d at 607 (Miller C.J., dissenting)(for voluntary waiver to occur the holder must make "a specific disclosure of the information the privilege holder shared with the counselor."). *See also* John W. Larson, South Dakota Evidence § 510.1 at 277–78 (1991) (disclosure of *the content* of the communication waives the privilege) (emphasis added).

[¶ 72.] The circuit court entered the following findings of fact on the testimony of William Davis:

> Guthrie had several conversations with William Davis regarding a sexual incident in Nebraska....
>
> Guthrie was the holder of the privileged communications made to William Davis. Guthrie voluntarily disclosed *the contents* of these communications to third parties and that this disclosure included the same information as related to the communications with William Davis.

These findings were made after defense counsel offered to stipulate that Guthrie discussed with William Davis the same matters he disclosed to other people. Additionally, Guthrie brought to the court's attention that he had given an extensive statement to law enforcement, "including all the matters ... at issue." With these admissions, we cannot say that the circuit court erred. *See Sleep,* 1999 SD 19, ¶ 6, 590 N.W.2d at 237. Consequently, we conclude that Guthrie voluntarily disclosed the contents of his confidential communica-

tions to others and waived the privilege under SDCL 19–13–26.

## J.

### Covert Tape Recording

[¶ 73.] Guthrie challenges the circuit court's decision to allow the jury to listen to a tape recording and follow along with a written transcript of the secretly recorded conversation between himself and his daughter. He contends that the tape impermissibly gave the jury the impression that Suzanne believed he was guilty, that law enforcement agents provided her with the recording device knowing that he had retained counsel, that he mentions in the taped conversation that he wanted a lawyer, and that his taped conversation was more prejudicial than probative. The crux of his argument is that this evidence should have been excluded under SDCL 19–12–3 (Rule 403). Our rules favor "the admission of evidence in the absence of strong considerations to the contrary." *State v. Wright,* 1999 SD 50, ¶ 15, 593 N.W.2d 792, 799 (citations omitted). Those objecting to admission have the burden of showing that the concerns addressed in Rule 403 substantially outweigh probative value. *Id.* at ¶ 16, 593 N.W.2d at 799 (citations omitted). As Guthrie did not object to the substance of Suzanne's testimony, the jury could have drawn the same inferences from her testimony as from the recording.

[¶ 74.] Guthrie claims that the recording and transcription were unfairly prejudicial because there were two instances where he remarked that he should speak with a lawyer. He alleges that officers provided Suzanne with a recording device knowing that he had retained counsel. The record does not bear this out. The circuit court entered findings of fact and conclusions of law on this issue, noting that Suzanne went to law enforcement officers

volunteering to confront her father. At that time, the court found, Suzanne "had no knowledge whether defendant may have contacted an attorney." Likewise, the court concluded that law enforcement officers did not know whether an attorney represented Guthrie when they provided Suzanne with the recording device. After reviewing the record, we cannot state that these findings were clearly erroneous or that the court abused its discretion in admitting the evidence. *See State v. Sleep*, 1999 SD 19, ¶ 6, 590 N.W.2d at 237 (citations omitted).

[¶ 75.] The trial court specifically found that Suzanne did not know whether her father had a lawyer before the taped conversation.

> On June 14, 1999, Suzanne Hewitt, along with her husband, went to the Beadle county deputy sheriff James Sheridan.... Jerry Lindberg, DCI investigator, was also at Sheridan's office. Suzanne visited with them and told them she wanted to get the truth ... At this time *she had no knowledge* whether Defendant may have contacted an attorney.

Her testimony at the evidentiary hearing supports this finding:

> Q: And again just what's your best recollection, can you tell the Court what the Defendant told you about an attorney?
>
> A: That he was being investigated and that presbytery told him to hire an attorney.

Later in the hearing she reiterated her lack of knowledge about her father's legal representation:

> Q: And up—between June 14th and when you went to visit with the Defendant with the tape recording, were you aware of any attorney that the defendant had hired?
>
> A: No.

▮▮▮ [¶ 76.] It is true that Agent Lindberg testified that Suzanne had told him "that her dad said not to talk to law enforcement unless his attorney was present...." But Lindberg also commented that "she didn't know who the attorney was or *if there was one.* She just said that he said not to talk to us unless his attorney was present." At best, there were conflicting indications about law enforcement's knowledge, and the trial court made a credibility determination to resolve those conflicts. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This argument was given a mere one sentence mention in Guthrie's brief: "Defendant objected to the audio-tape and the transcript on the grounds that it inferred [sic] that Suzanne Hewitt was cooperating with law enforcement and thus she believed that the Defendant was guilty, and on the further grounds that agents of the State knew prior to the interview of the Defendant by Hewitt that the Defendant had retained counsel." Guthrie offered no authority or elaboration on this point. And no prejudice was shown. He made no incriminating statements to his daughter during the taped conversation.

▮▮▮ [¶ 77.] Lastly, use of the transcript to aid the jury was in conformance with the guidelines set forth in *State v. Faehnrich*, 359 N.W.2d 895, 899 (S.D. 1984). The transcripts were checked for accuracy, were necessary because of audio difficulties (here the tape contained an echo), the circuit court instructed the jury on the proper use of the transcript and told the jury to rely on the tape itself if contradictions were present, and the transcripts were promptly collected afterwards. *See Faehnrich*, 359 N.W.2d at 899.

## K.

### Summary

[¶ 78.] The circuit court abused its discretion in allowing the suicidologist to tell the jury that the deceased did not commit suicide, but the testimony was not prejudicial. The court did not err in finding that the suicidologist's methodology was sufficiently reliable. There was no error in denying Guthrie's motion for acquittal, as there was sufficient evidence to sustain a finding of guilt beyond a reasonable doubt. The court did not erroneously deny Guthrie's motion to suppress evidence obtained without a valid search warrant, as the evidence was obtained via lawful third party consent. The court did not abuse its discretion in denying Guthrie the opportunity to present surrebuttal evidence from his fingerprint expert. We find that only a portion of the testimony of William Davis was privileged and statements within the privilege were waived. Finally, the circuit court did not abuse its discretion in allowing the jury to listen to the audiotape and read a transcript of that tape.

[¶ 79.] Affirmed.

[¶ 80.] AMUNDSON, Justice, concurs on Issues 1, 2, 3, 4, and 5 and joins Justice Sabers' dissent on Issue 6.

[¶ 81.] MILLER, Chief Justice, and GILBERTSON, Justice, concur in part and concur in result in part.

[¶ 82.] SABERS, Justice, concurs in part and dissents in part.

GILBERTSON, Justice (concurring in part and concurring in result in part).

[¶ 83.] I concur with the lead opinion on all issues except its conclusion that the trial court abused its discretion in allowing Dr. Berman to testify that in his opinion, Sharon Guthrie did not commit suicide. The trial court did not abuse its discretion in the admission of this testimony as (1) it is not ultimate issue testimony in this case, and (2) even if it were, under *Daubert* and our standard of review it is admissible.

[¶ 84.] The standard under which we review this case plays a critical role in its final determination. A trial court is granted broad discretion when a decision to admit testimony is reviewed on appeal, and its decision will stand absent an abuse of that discretion. *State v. Edelman*, 1999 SD 52, ¶ 4, 593 N.W.2d 419, 421. We will not reverse a trial court's evidentiary ruling if "we believe a judicial mind, in view of the law and the circumstances, could reasonably have reached that conclusion." *Dakota Cheese, Inc. v. Taylor*, 525 N.W.2d 713, 715 (S.D.1995). Under the abuse of discretion standard, "we must be careful not to substitute our reasoning for that of the trial court." *State v. Larson*, 512 N.W.2d 732, 736 (S.D.1994). Only with these principles in mind can we properly resolve this issue.

[¶ 85.] Expert testimony, when relevant, is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue" and if it "rests on a reliable foundation." SDCL 19–15–2; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993). The lead opinion correctly concludes that Dr. Berman's testimony as to Sharon's state of mind was relevant, helpful to the jury, and based on a reliable foundation. And yet, the lead opinion concludes the trial court abused the broad discretion bestowed upon it by allowing Dr. Berman to testify that in his opinion, Sharon Guthrie did not commit suicide. I respectfully disagree.

[¶ 86.] The lead opinion states it does not reach the ultimate issue determination. Instead, it concludes that Dr. Berman's ultimate opinion is unreliable under *Dau-*

*bert.*[17] Yet, Dr. Berman's prior testimony, where he explained common risk factors of suicide victims and compared those factors to the present case, was reliable under *Daubert.* While the lead opinion couches its decision in terms of reliability, it is quite clear that Dr. Berman's ultimate opinion is unreliable because it is perceived as an ultimate opinion.[18] Because remnants of the ultimate issue rule form the foundation for the lead opinion's conclusion, and are directly addressed by the dissent, it is necessary to address it here.

[¶ 87.] The ultimate issue of fact for the jury to determine in this instance is whether William Guthrie murdered his wife, Sharon. Guthrie stipulated to no elements of the charge. Therefore, in this circumstantial evidence case, the State shoulders the burden of proving each element of the charge beyond a reasonable doubt. To prove each element of murder, the State must disprove all other manners of death, including suicide or accident. While a jury determination of suicide would result in an acquittal, a finding to the contrary does not automatically result in a conviction. The testimony by Dr. Berman helped exclude one manner of death.[19] The State was still required to prove Sharon did not die accidentally, as well as the identity of the perpetrator. As in *State v. Barber,* 1996 SD 96, ¶ 38, 552 N.W.2d 817, 823, here there is no basis to conclude that the expert testimony " 'devoured the issue before the jury.' " Rather, as in *Barber,* here the disputed testimony stops well short of expressing the opinion "that [Guthrie] was guilty of the offense charged." *Id.*

[¶ 88.] In 1993, South Dakota repealed the ultimate issue rule with the adoption of SDCL 19–15–4,[20] which provides: "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Prior to the adoption of that statute, South Dakota was the only state in the nation which still adhered to the prohibition against testimony by an expert on an ultimate issue of fact. *State v. Burtzlaff,* 493 N.W.2d 1, 11 (S.D.1992) (Wuest, J., concurring in part and dissenting in part) (citing 2 Gregory P. Joseph & Stephen A. Salzburg, Evidence in America: The Federal Rules In The States, ch 53, 1 (1987)). Since the

---

17. The lead opinion states that psychological autopsies are a "relatively new, unrefined, and unresearched clinical technique," and therefore are unreliable. It should be noted that the lead opinion's legal authorities for this proposition are law review articles published six and eight years ago respectively. Moreover, the author's concern is apparently not shared by appellate courts as not a single jurisdiction is cited as being in subsequent accord.

18. The lead opinion declares:

A few courts have allowed psychological autopsy evidence in cases where the question before the jury in a homicide prosecution was whether the deceased died from suicide. In those cases, however, the experts did not opine with scientific certitude that the deceased did or did not commit suicide.

Lead Op. ¶ 40.

19. I question the lead opinion's conclusion that Dr. Berman's testimony "approached the impermissible" and created an "inference" as to Guthrie's guilt. Before the enactment of SDCL 19–15–4, experts were not allowed to testify on ultimate issues. Are they now prohibited, despite the adoption of that statute, from testifying as to "inferences?" In certain instances it is difficult enough to determine what constitutes an ultimate issue let alone an "inference" of such. The use of this novel standard will only serve to further confuse this issue.

20. Thus, reliance upon cases such as *State v. Hill,* 463 N.W.2d 674 (S.D.1990) by the dissent are not particularly helpful in an analysis of the issue now before us which is controlled by the 1993 enactment of SDCL 19–15–4.

adoption of 19–15–4, we have limited the rule such that, in general, an expert cannot testify as to the credibility of another witness.[21] *State v. Raymond*, 540 N.W.2d 407, 410 (S.D.1995). We have also held that an expert cannot testify as to legal conclusions. *Robbins v. Buntrock*, 1996 SD 84, ¶ 8, 550 N.W.2d 422, 425; *Zens v. Harrison*, 538 N.W.2d 794, 796 (S.D.1995). In addition, we have stated that an expert can testify as to ultimate issues, "as long as the witness is not asked whether the defendant is innocent or guilty." *Barber*, 1996 SD 96, ¶ 38, 552 N.W.2d at 823.

[¶ 89.] In both *Zens* and *Robbins* the trial court's evidentiary ruling was to preclude the evidence. Thus, the posture of the issue on appeal before us was whether the trial court abused its discretion in precluding the evidence. *Robbins*, 1996 SD 84, ¶ 8, 550 N.W.2d at 425; *Zens*, 538 N.W.2d at 796. However, here the question before us is whether the circuit court abused its discretion in admitting, rather than excluding, the evidence. "The test is not whether we would make a similar ruling, but rather whether a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Barber*, 1996 SD 96, ¶ 14, 552 N.W.2d at 820. "[Abuse of discretion] is the most deferential standard of review available with the exception of no review at all." *State v. Chamley*, 1997 SD 107, ¶ 51, 568 N.W.2d 607, 620 (Gilbertson, J., dissenting) (citing Martha S. Davis, *Basic Guide to Standards of Judicial Review*, 33 SD Law Rev. 468, 480 (1988) (alterations in original)). As such, it is not surprising

that neither the lead opinion nor dissent is able to cite to a single case in which this Court reversed the admission of expert testimony under the restrictive theories of admissibility they now advocate.

[¶ 90.] In both *Robbins* and *Zens*, no abuse of discretion was found to exist as the precluded evidence sought to directly inform the jury as to which party was negligent. We found that testimony impermissibly entered the realm of ultimate legal conclusions. 1996 SD 84, ¶ 8, 550 N.W.2d at 425; 538 N.W.2d at 796. While negligence is a legal conclusion, suicide is instead a factual determination. Suicide is statutorily defined as "the intentional taking of one's own life." SDCL 22–16–36. Clearly, no legal conclusion is required to find suicide, therefore neither *Zens* nor *Robbins* mandate a finding of abuse of discretion in this instance. The testimony at issue here is more similar to that expressed in *Barber*, where the defendant was charged with conspiracy to distribute a controlled substance. In that case, an expert concluded that the defendant was engaged in drug trafficking operations. *Barber*, 1996 SD 96, ¶ 38, 552 N.W.2d at 823. We held the trial court did not abuse its discretion by admitting that testimony. *Id.*

[¶ 91.] Despite the mandate of SDCL 19–15–4, and the deference owed the trial court, the lead opinion finds the trial court abused its considerable discretion when it allowed Dr. Berman to state "[i]n my opinion Sharon Guthrie did not die by suicide." Under the lead opinion's analysis, only the admission of that statement was an abuse

---

21. The lead opinion states that experts are generally permitted to testify that a victim's behavior is "consistent with" that of known victims. Lead Op. ¶ 41. The cases cited for this proposition all limit the expert's testimony because any "ultimate" conclusion would tend to buttress the credibility of the victim or another witness. Under our case law, the admission of such testimony would clearly be an abuse of discretion. *See Raymond, infra.* However, Dr. Berman's opinion does not weigh on the credibility of any witness in this case. Therefore, the concerns expressed by those cases, while valid, are inapplicable to this case.

of discretion, while all non-ultimate issue testimony was properly admitted. I see no basis under SDCL 19–15–4 or *Daubert* to accord one standard for the admissibility of expert testimony, but employ another, more stringent standard before ultimate issue testimony will be admitted. In light of the explicit statutory abrogation of the ultimate issue rule, this result could lead to confusion, and at worst, eventually result in a judicial annulment of SDCL 19–15–4. If the non-ultimate issue testimony is relevant, reliable and helpful enough to be admissible under *Daubert*, the ultimate issue testimony should also be found relevant, reliable and helpful enough to be admitted. *See State v. Alberico*, 116 N.M. 156, 861 P.2d 192, 210 (1993) (noting that if post-traumatic stress disorder evidence is reliable and admissible for one purpose, it is reliable and admissible for all purposes). To hold otherwise will resurrect the "irreconcilable confusion" and "embarrassing inconsistencies" that resulted under the ultimate issue rule. *Burtzlaff*, 493 N.W.2d at 12 (Wuest, J., concurring in part and dissenting in part). The lead opinion's framework will once again require the bench and bar to wrestle with what the ultimate issue of fact is in a given scenario. *Id.* at 11 (Wuest, J., concurring in part and dissenting in part). In this case, is the ultimate issue Sharon's suicide? Or, is it William's guilt or innocence as to the crime charged? If an expert will testify as to an ultimate issue of fact, is another *Daubert* hearing required to judge the reliability, relevance, and helpfulness of the ultimate issue testimony? This resulting legal quagmire is the precise situation SDCL 19–15–4 sought to remedy.

[¶ 92.] The lead opinion determines Dr. Berman is qualified as an expert as to his non-ultimate issue testimony, yet he is unqualified to discuss this issue of "ultimate fact". This conclusion is prefaced by noting that Dr. Berman's ultimate fact opinion was based on "observation and experience, not traditional empirical studies." Lead Op. ¶ 41. An expert may be qualified by his "knowledge, skill, experience, training, or education...." SDCL 19–15–2. Because the disjunctive *or* is used in the statute, an expert can be qualified under any one of the five categories listed. *Nickles v. Schild*, 2000 SD 131, ¶ 10, 617 N.W.2d 659, 661. Yet, under the lead opinion's analysis, Dr. Berman's experience and observation are not enough to allow him to testify that in his opinion, Sharon Guthrie did not commit suicide. Have we created two classes of experts, one qualified to testify on ultimate facts, the other not? Must there be a separate *Daubert* hearing on the qualifications of ultimate issue experts? The lead opinion also finds Dr. Berman's testimony relating common risk factors to Sharon's situation to be "relevant, helpful and admissible" and thus reliable, yet his ultimate conclusion is unreliable. Have we now also created two classes of reliability, one for ultimate issue testimony and one for non-ultimate issue testimony? Again, the bar and bench will be confronted with issues that should have been laid to rest with the adoption of SDCL 19–15–4. This result is clearly contrary to the "uniform procedure for addressing expert testimony" envisioned by *Daubert*. *Rogen v. Monson*, 2000 SD 51, ¶ 26, 609 N.W.2d 456, 462 (Konenkamp, J., concurring).

[¶ 93.] Other jurisdictions have allowed psychological autopsy evidence to be admitted in cases, such as the case at bar, where the decedent's state of mind is at issue. *Horinek v. State*, 977 S.W.2d 696, 701 (Tex.App.1998); *U.S. v. St. Jean*, 1995 WL 106960 *2 (A.F.Ct.Crim.App.1995); *In re Estate of Hoover*, 155 Ill.2d 402, 185 Ill.Dec. 866, 615 N.E.2d 736, 744–45 (1993); *Jackson v. State*, 553 So.2d 719, 720 (Fla. Dist.Ct.App.1989); *Harvey v. Raleigh Po-*

*lice Dep't*, 85 N.C.App. 540, 355 S.E.2d 147, 152 (1987); *Campbell v. Young Motor Co.*, 211 Mont. 68, 684 P.2d 1101, 1104 (1984). *See also Kostelac v. Feldman's, Inc.*, 497 N.W.2d 853 (Iowa 1993) *and Terrell State Hosp. v. Ashworth*, 794 S.W.2d 937 (Tex.App.1990) (discussing psychological autopsies as used in the case, without discussing admissibility as an issue on appeal).[22] In addition, this Court has noted that "[p]sychological autopsies have been admitted where the victim's state of mind was relevant." *Burtzlaff,* 493 N.W.2d at 5. More recently, this Court allowed a psychiatric expert to testify as to a decedent's testamentary capacity. *In re Estate of Dokken*, 2000 SD 9, ¶ 44, 604 N.W.2d 487, 499. Under an abuse of discretion standard of review, how can we draw a distinction between an opinion that a decedent was legally capable of executing a will and an opinion that a decedent did not commit suicide?

[¶ 94.] The lead opinion creates a two-tiered reliability analysis, which results in a bifurcation of the *Daubert* requirement of reliability. On one tier is expert testimony, which is examined under *Daubert* principles. On the second tier is ultimate issue expert testimony, or "inferences" thereto, which apparently is subject to a higher scrutiny. Such a result might be acceptable if there were any legal authority to support it. However, the only conceivable authority is the ultimate issue rule, which was repealed in 1993.

[¶ 95.] I agree with the lead opinion that the trial court did not abuse its discretion in allowing Dr. Berman to testify regarding common risk factors of suicide victims and relate those factors to Sharon Guthrie. As the lead opinion concludes, that testimony is reliable under *Daubert.* However, I cannot conclude that Dr. Berman's opinion that Sharon Guthrie did not commit suicide was somehow unreliable, or inadmissible under SDCL 19–15–4.[23] The

**22.** The legal issue involved in these cases is entirely irrelevant under the *Daubert* reliability standard. If psychological profiles are reliable enough to be admitted in a worker's compensation proceeding or will contest, why are they not reliable enough to be admitted in criminal proceedings?

The lead opinion claims that *Horinek* and *St. Jean* support its conclusion, and not one case cited above "allows giving an opinion like the one Dr. Berman gave here." In *St. Jean*, the trial court limited the expert testimony to "the profile of one who is, psychiatrically speaking, suicidal or a suicidal risk." 1995 WL 106960 *1. In *Horinek*, the expert testified "that it appeared very unlikely that this individual would be the sort of person to kill herself." 977 S.W.2d at 701. In both cases, the decision of the trial court was affirmed under an abuse of discretion standard. Two lessons can be drawn from those cases. First, the psychological autopsy evidence was admissible. Second, the trial court's decision was affirmed under the proper standard of review.

As noted previously, other cases exclude conclusions that tend to weigh on a witness's credibility. That concern is not an issue in this case.

Moreover, it should also be noted that no case cited by the lead opinion adopts or even supports the bifurcated reliability analysis which is now proposed.

**23.** In addition to creating this two-tiered analysis, the lead opinion constructs an unacceptable rationale when it concludes this testimony was harmless error because the jury had already heard "the absence of [Dr. Berman's] suicidal indicators and the totality of the evidence offered at trial." Under the lead opinion's analysis, the ultimate conclusion was harmless because Dr. Berman testified as to how he reached his conclusion. Therefore, as long as an expert testifies as to the basis of his conclusion before stating that ultimate opinion, how can there ever exist reversible error? As long as an expert's testimony avoids the pitfalls of legal conclusions and comments on a witness' or victim's credibility, reversible error will only exist if the entirety of the expert's testimony is "In my opinion, X happened."

ultimate issue prohibition was put to rest in 1993, there is no need to exhume it now.

[¶ 96.] For the above reasons I would outright affirm the trial court on this issue. As there is no majority opinion regarding the rationale for adjudication of this issue, resolution of the conflicting theories set forth in the various writings of this case await a future decision of this Court.

[¶ 97.] MILLER, Chief Justice, joins this special writing.

SABERS, Justice (concurring in part and dissenting in part).

[¶ 98.] The lead opinion purports to justify to the reader that no error occurred below or that the errors were harmless or nonprejudicial. I write specially to analyze these claims independently and conclude that substantial prejudicial error tainted Guthrie's trial. Therefore, I dissent. We should reverse and remand for a fair trial.

[¶ 99.] **1. IMPROPER EXPERT OPINION TESTIMONY THAT GUTHRIE MURDERED HIS WIFE BECAUSE IT WAS NOT SUICIDE.**

[¶ 100.] Dr. Berman's testimony as a suicidologist was relevant and helpful to the jury. This testimony was crucial evidence concerning the ultimate issue of whether Sharon's death was caused by suicide, accident or murder. The necessity of such testimony was reinforced by the State's theory of the case. The State contended from the outset that by eliminating the other potential causes of death, it would prove that Sharon was murdered by Guthrie. However, in so doing, the State was bound to use admissible expert testimony. *See State v. Werner*, 482 N.W.2d 286, 291 (S.D.1992); *United States v. St. Jean*, 1995 WL 106960 *2.

[¶ 101.] As the lead opinion recognizes, Dr. Berman's testimony "moved from imparting typical characteristics and whether Sharon met a suicidal profile, to *declaring that based on her profile she did not commit suicide.*" (Emphasis added). I agree with the lead opinion's determination that such testimony was inadmissible expert testimony. Such psychological profile failed to meet the criteria under *Daubert* to declare with certainty that a person committed suicide. In fact, even with the proper scientific basis, such opinion testimony would necessarily have invaded the province of the jury.

[¶ 102.] Such testimony is improper where an expert attempts to opine on the ultimate issue squarely before the jury. *See Zens v. Harrison*, 538 N.W.2d 794, 796 (expert cannot determine negligence as that role is exclusively for a jury); *State v. Hill*, 463 N.W.2d 674, 677 (S.D.1990) (the "proper subject matter" of expert testimony does not include experts testifying as the credibility of witnesses as that role is exclusively for a jury). Though trials are sometimes a battle of experts, the experts should not decide them, juries should.

[¶ 103.] I agree with the lead opinion that the trial court abused its discretion by allowing such testimony. However, I part company with the conclusion of the lead opinion that any error was harmless. The State's method of prosecuting this case, though in all fairness a proper method, clearly highlights the prejudicial effect of this improper testimony. From the outset, the State operated under the theory that Guthrie was guilty of murder because there was no other explanation for this tragic death. This expert's testimony was necessary for the State to dispense with Guthrie's theory that Sharon died as a result of suicide, thereby prejudicially damning Guthrie.

[¶ 104.] The lead opinion incorrectly concludes, "we cannot say that in the ab-

sence of Dr. Berman's ultimate opinion the jury verdict would have been different." I am convinced that an expert's statement that the decedent did not commit suicide and therefore the only remaining option was murder contributed to the verdict. There is little that would have been more harmful in the context of this prosecution. As this testimony unduly influenced and infected the trial, I dissent from the lead opinion's determination that this error was harmless.

[¶ 105.] Both the lead opinion and the special concurrence get it half right. I agree with the lead opinion's conclusion that this testimony was relevant to a certain point. However, once that threshold was crossed and the expert was allowed to state, with the pretense of scientific certainty, that the decedent did not commit suicide, it became clearly improper. It both invaded the province of the jury and was without proper scientific foundation. However, even the concurrence recognizes that if the lead opinion is accepted, its unwillingness to recognize this as harmful error is absurd. The concurrence rhetorically asks, "[t]herefore, as long as an expert testifies to the basis of his conclusion before stating [the] ultimate opinion, how can there ever exist reversible error?" My addition to this exchange is simple, expert testimony embracing an issue to be resolved by the jury without the proper scientific foundation is reversible error.[24]

[¶ 106.]**2. TAPE RECORDED CONVERSATION BY GUTHRIE'S DAUGHTER.**

[¶ 107.] The lead opinion determines that the admission of the daughter's re-

cording coupled with the written transcript was acceptable. In so doing, the lead opinion ignores an important mistake of law that occurred below based on admitted facts. Though defense counsel has not argued this point with proper emphasis, I dissent to the conclusion of the lead opinion.

[¶ 108.] Suzanne Hewitt, Guthrie's oldest daughter, met with her father and recorded a conversation in which she confronted him about her mother's death. On a motion to exclude this testimony, Suzanne testified that she went to the police station to help and was not sure who suggested the tape recording device, that the recording device was supplied by the officers, and that "at the end of the [recorded] conversation he said he needed to talk to his attorney before he could talk to me anymore." Additionally, during examination of DCI Agent Lindberg the following exchange occurred:

Q: Do you remember during that conversation Suzanne mentioning something about an attorney that [Guthrie] had talked about?

A: Well, when she first came in to talk to us she said that her dad said not to talk to law enforcement unless his attorney was present and she stated I will talk to whoever I want to and she wasn't going to be bound by that.

Q: Did you try to get information from her on who this attorney was?

A: As I recall she didn't know who the attorney was or if there was one. She just

---

24. In all practicality, the lead opinion and the concurrence place our trial courts in tenuous positions. The lead opinion requires the trial court to limit the expert before the testimony becomes improper. The concurrence recognizes that trial court's will have difficulty de-

termining when that threshold has been crossed. This is wrong because difficulty in the process doesn't justify the harm. Both result in a "just let it slide approach." I challenge this Court to do better.

said that he said not to talk to us unless his attorney was present.

THE COURT: Unless whose attorney was present?

Agent Lindberg: His. Mr. Guthrie's.

In further examination of DCI Agent Lindberg, defense counsel elicited:

Q: And so there is no doubt, ... Mr. Lindberg, Suzanne Hewitt told you on June 14 of this year that her father told her not to talk to you until—without Mr. Guthrie's attorney present?

A: That's correct.

The taping of the conversation between father and daughter occurred over a month later on July 26. Later that same day, the Division of Criminal Investigation contacted Guthrie for an interview. The agents were told "he retained an attorney and wasn't going to talk."

[¶ 109.] Under these facts, the use of Guthrie's daughter as an agent of the State to produce evidence in the criminal investigation constituted a violation of Guthrie's Fifth Amendment right against self-incrimination.

[¶ 110.] As Guthrie had not been formally indicted his Sixth Amendment right to have counsel present during any questioning by a State agent had not yet attached. *See Massiah v. U.S.*, 377 U.S. 201, 84 S.Ct. 1199 12 L.Ed.2d 246 (1964); *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). However, as he was a suspect and being questioned by his daughter on behalf of the State, his Fifth Amendment privilege against self-incrimination did exist. To protect Guthrie's right against self-incrimination he "has a right to the presence of an attorney, either retained or appointed. [Guthrie] may waive [ ] these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicated in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

[¶ 111.] "Once an accused requests the assistance of counsel the current interrogation must cease and the suspect cannot be approached for further questioning until counsel is made available. Similarly, a defendant may not be subjected to the 'functional equivalent' of interrogation, namely words or actions on the part of the police that are likely to elicit an 'incriminating response.' " *State v. Morato*, 2000 SD 149, ¶ 23, 619 N.W.2d 655, 662. (Citations omitted). The protection of the defendant's right against self incrimination recognized by *Miranda* and its progeny should be "strictly enforced to prohibit any questioning of an accused once counsel has been requested." *State v. Arpan*, 277 N.W.2d 597, 599 (S.D.1979).

[¶ 112.] It is clear from the record that Guthrie was targeted by the Division of Criminal Investigation as a suspect in the tragic death of his wife. It is also apparent that the State must be allowed to question suspects in order to investigate crimes. However, our constitution provides all individuals with the right against self-incrimination. To protect this right, counsel is an invaluable tool and once the police are aware that a suspect has retained counsel or requests counsel questioning must cease. This includes all agents of the State. *See Massiah*, 377 U.S. at 206, 84 S.Ct. at 1199, 12 L.Ed.2d 246, 250 (stating that if the protections afforded "have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse"). The State cannot take advantage of a daughter's breach of trust to her father even if it was her idea and she volunteers. Here, as in *Massiah*, Guthrie "was more seriously imposed upon ... because he didn't even know that he was

under interrogation by a government agent." *Id.*

[¶ 113.] As early as June 14, law enforcement was aware that Guthrie had employed counsel or would not submit to further interrogation without counsel present. Despite this fact, on July 26, the State wired Guthrie's daughter and elicited statements from him through the use of this intimate relationship. Guthrie ended the conversation with his daughter by stating he "needed to talk to his attorney before he could talk to [her] anymore." This clearly establishes his expectation of privacy and confidentiality with his daughter. When we consider the State's role in this daughter's breach of trust to her father, it is obvious that displaying this testimony to the jury was so prejudicial it requires a new trial in its own right. As this improper recording was heard by the jury, then transcribed and distributed to the jury, I dissent.

[¶ 114.] We should reverse and remand for a new trial on both issues.

[¶ 115.] AMUNDSON, Justice, joins this special writing as to issue 6.