#29900-a-SRJ
**2022 S.D. 79**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

NEWS AMERICA MARKETING and
FARMINGTON CASUALTY COMPANY,     Employer, Insurer, and
                                 Appellants,


            v.

DESTINY SCHOON,                  Claimant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CHRISTINA L. KLINGER
Judge

\* \* \* \*

SETH A. LOPOUR
J.G. SHULTZ of
Woods, Fuller, Shultz & Smith, P.C.
Sioux Falls, South Dakota          Attorneys for employer, insurer,
                                   and appellants.


BRAD J. LEE of
Beardsley, Jensen & Lee, Prof. LLC
Rapid City, South Dakota           Attorneys for claimant
                                   and appellee.

\* \* \* \*

ARGUED
NOVEMBER 8, 2022
OPINION FILED **12/28/22**

#29900

JENSEN, Chief Justice

[¶1.]        Destiny Schoon (Claimant) injured her shoulder and neck while working for News America Marketing (Employer). Employer and Farmington Casualty Company (Employer/Insurer) initially paid benefits to Claimant, but subsequently denied her claim for surgery and additional benefits. Claimant petitioned the South Dakota Department of Labor and Regulation (Department) for a hearing on her claims, which resulted in a decision approving her request for benefits. The circuit court entered an order affirming the Department's decision. Employer/Insurer appeals from the circuit court's order. We affirm.

## Facts and Procedural History

[¶2.]        Claimant was injured on May 7, 2015, while working part-time for Employer as an advertising representative.[1] Her duties consisted of hanging advertising signage on shelves and ceilings in stores, as well as data entry. Claimant reported that she was injured while using a screwdriver to mount a shelf. She described how she was "cranking" on the screwdriver to loosen a screw when the screwdriver gave way, and she immediately felt a sharp pain in her right shoulder that worsened over the next 24 hours. Claimant testified at the hearing before the Department that when the injury occurred she felt severe pain in her shoulder area and that her neck began to tighten.

[¶3.]        Claimant sought chiropractic treatment the next day at Black Hills Health and Wellness Center. The medical record of that visit notes that Claimant

---

1.        At the time of the injury, Claimant was also employed full-time as a paralegal at a Rapid City law firm.

complained of loss of motion and spasms in her neck. She was diagnosed with a neck strain. The record from a second visit shows that she continued to complain about her neck as well as pain in her right shoulder.

[¶4.] Claimant was referred to Black Hills Orthopedic and Spine Center and attended her first appointment on May 18, 2015. The record from that visit identifies right shoulder pain as her chief complaint and includes a plan to evaluate and treat her for right shoulder and neck strain. She began physical therapy and was then referred to Dr. Lawlor, a rehabilitation and pain medicine specialist, who had previously treated Claimant for prior injuries to her neck and shoulder. Claimant's symptoms from the work injury included pain, numbness, and tingling down her arm and into her fingers. Dr. Lawlor prescribed additional physical therapy and ordered a cervical MRI. The MRI showed a C5-6 herniation. Dr. Lawlor referred Claimant to Dr. Wilson, a neurosurgeon. Dr. Wilson explained that numbness and tingling were likely caused by radiculopathy from the herniated disc and recommended surgery to replace the disc with an artificial disc.

[¶5.] Claimant sought pre-approval from Employer/Insurer to pay for the procedure. In response, Employer/Insurer retained Dr. Nipper to conduct an independent medical examination (IME) of Claimant. The IME included a physical examination of Claimant and a review of her medical records. In the IME report, Dr. Nipper opined that Claimant only strained her shoulder and that the herniation at C5-6 was preexisting and unrelated to her work injury. He noted that "[t]here is no record of [Claimant] complaining of pain in the neck during her first visits with

[PA] Winters at Black Hills Orthopedic and Spine Center."[2] Dr. Nipper also disagreed with Dr. Wilson's opinion that Claimant's pattern of pain aligned with the affected discs, but in his deposition agreed that pain and numbness in one part of the body can originate elsewhere. Employer/Insurer denied the claim based on Dr. Nipper's IME report. Despite the denial, Claimant proceeded with the surgery. The surgery resolved some of Claimant's cervical radiculopathies, including the numbness in her arms, but not all of her pain.

[¶6.]     Claimant's preexisting medical history involved three injuries to her neck and right shoulder areas. Claimant sustained neck and shoulder injuries due to motor vehicle accidents in 2001 and 2003. Claimant was diagnosed with whiplash after the first accident. Approximately ten months after that accident, Claimant continued to complain of "[c]onstant upper back pain into the neck and shoulders[.]" Following the second accident, Claimant was again treated for pain in her neck and right shoulder. More than nine months post-accident, Claimant continued to complain of "constant neck and shoulder pain." She continued regular chiropractic treatments for these injuries for several years following the accidents.

[¶7.]     Claimant fractured her wrist in a 2004 slip and fall and underwent surgery. The fall also exacerbated her prior neck and shoulder injuries, which she alleged, in a lawsuit against the city and concert venue where she fell, caused her to "suffer[] serious and permanent personal injuries[.]" On June 23, 2005, her medical records show that she "reached what she considered pre-injury status of her car

---

2.     Dr. Nipper did not have Claimant's complete records, and his report does not reflect Claimant's chiropractic treatment prior to May 18, 2015.

accident injuries—upper back, mid back, and neck. The car accident condition has improved and is now considered resolved." Still experiencing pain from the fall, however, she continued regularly treating with a chiropractor for back and neck pain.

[¶8.] In 2008, a chiropractor who had treated Claimant offered an opinion in her slip and fall lawsuit that she would "have residuals from her accident injuries for the rest of her life or until some other treatment is discovered that will repair her injuries." Notes from a provider in 2008 show Claimant reported her shoulder pain had "been getting worse as time [went] on[,]" she had "neck problems[,]" and she was "wondering if this could be a problem." Another expert opinion letter offered in the slip and fall lawsuit included the provider's opinion that "the injuries that she has been dealing with will be permanent[.]" Claimant had also been diagnosed with fibromyalgia, depression, and degenerative disc disease prior to her 2015 work injury.

[¶9.] Claimant had a cervical MRI in 2009 that showed some impingement at C5-6 but not to the degree the 2015 MRI showed following her work injury. Dr. Dietrich compared these two MRIs and noted the change at C5-6, which he stated was objective evidence that her condition had changed. Dr. Nipper opined that the task Claimant was performing could not have caused her cervical injury but agreed that the 2015 MRI was worse.

[¶10.] In 2009, Dr. Lawlor performed cervical facet area injections in an effort to reduce Claimant's level of pain. Claimant testified that the injections significantly reduced her neck and shoulder pain and that she was able to work

sixty hours per week and play softball with only occasional flare-ups until the 2015 work injury. Despite her past medical history, Claimant explained that her "pain was pretty much nonexistent other than an occasional flare-up" from 2009 until her 2015 work injury. She testified that she was able to manage pain with Flector patches and returned to work and other normal activities without significant limitation or treatment. Claimant described how after the 2015 work injury, her pain and symptoms in her neck and shoulder increased significantly.

[¶11.] Claimant presented expert opinions from three of her treating physicians at the hearing. Medical records from Dr. Lawlor and Dr. Wilson, along with their opinion letters and affidavits were introduced in lieu of live testimony. Dr. Dietrich's medical records and deposition testimony were also submitted at the hearing.

[¶12.] Dr. Lawlor's letter was a response to Employer/Insurer's request to justify treatment as related to Claimant's shoulder. In it, he explained that Claimant's 2015 cervical MRI showed C5-6 herniation. He noted that reporting shoulder pain as a predominate complaint was "not uncommon for people with a C5-6 disc herniation[,]" and it was appropriate to "address the neck as it relates to her shoulder pain" in physical therapy.

[¶13.] Dr. Wilson's letter explained that Dr. Lawlor had referred Claimant to him for further evaluation and that he had personally reviewed her MRI. He opined that "the event at work while lifting a sign over her head is directly related to her C5-6 herniation and ongoing neurologic symptoms." Given her age, he

recommended C5-6 cervical disc replacement as a durable treatment of her symptoms.

[¶14.]      On July 16, 2019, Dr. Dietrich performed an impairment evaluation and determined that Claimant was 11% impaired. At Dr. Dietrich's deposition, Employer/Insurer objected to his testimony regarding causation and the need for medical treatment, asserting he could not state his opinion to a reasonable degree of medical probability because he had not seen every record of Claimant's treatment for her preexisting injuries. Over that objection, Dr. Dietrich opined that the objective changes observable between the two cervical MRIs reflected "significantly more than you would expect to see in a 33 year old with a slight disc protrusion" over that period in the absence of trauma of some sort. He testified that he believed her 2015 work injury exacerbated her underlying cervical disc problems and led to the treatment and surgery that followed. He confirmed that he had treated other patients in the past for similar injuries sustained doing similar tasks and that such injuries may cause referred pain. He predicted that Claimant occasionally would require injections or medication going forward and recommended that she continue physical therapy independently at home.

[¶15.]      In anticipation of the hearing before the Department, Dr. Nipper prepared an independent record review as an addendum to the initial IME report. Dr. Nipper reaffirmed his opinion that the strain resolved six weeks after the event, Claimant had reached maximum medical improvement by June 18, 2015, and any symptoms beyond that time resulted from degenerative processes and preexisting conditions predating May 7, 2015. In a response to interrogatories, he claimed

"[t]here is no conceivable way that the demise of the C5-6 disc was caused by the activity on or around May 7, 2015. It is simply not plausible." However, Dr. Nipper admitted in his deposition that "if you're asking if the surgery was appropriate regardless of cause, then my answer would be yes." The addendum also reflects that Claimant received facet joint injections from Dr. Dietrich in August 2016 and trigger point injections intermittently thereafter.

[¶16.]    The Department issued a decision approving Claimant's request for benefits and entered findings of fact and conclusions of law. The Department awarded Claimant permanent partial disability benefits, medical expenses, and prejudgment interest. The Department further ordered Employer/Insurer to pay for Claimant's future medical treatment related to her work injury. Employer/Insurer appealed the decision to the circuit court. The court issued a memorandum opinion and order affirming the Department's decision on December 27, 2021.

[¶17.]    Employer/Insurer raises three issues on appeal, which we restate as follows:

1. Whether the circuit court erred by affirming the Department's holding that Claimant's work injury was and remained a major contributing cause of her impairment and need for treatment.

2. Whether the circuit court erred in affirming the Department's finding of an adequate foundation for Dr. Dietrich's opinion.

3. Whether the circuit court erred by finding the opinions of Drs. Dietrich, Wilson, and Lawlor more persuasive than that of Dr. Nipper.

## Standard of Review

[¶18.] "We review the Department's decision in the same manner as the circuit court." *Hughes v. Dakota Mill and Grain, Inc.*, 2021 S.D. 31, ¶ 12, 959 N.W.2d 903, 907; *see* SDCL 1-26-37; SDCL 1-26-36. We review the Department's findings of fact for clear error and overturn them only if "after reviewing the evidence we are left with a definite and firm conviction that a mistake has been made." *Hughes*, 2021 S.D. 31, ¶ 12, 959 N.W.2d at 907 (quoting *Schneider v. S.D. Dep't of Transp.*, 2001 S.D. 70, ¶ 10, 628 N.W.2d 725, 728). But "[w]e review the Department's factual determinations based on documentary evidence, such as depositions and medical records, de novo." *Id.*; *see Peterson v. Evangelical Lutheran Good Samaritan Soc'y*, 2012 S.D. 52, ¶¶ 18–19, 816 N.W.2d 843, 849 (explaining that proposed amendments to SDCL 1-26-36 failed, leaving this standard of review intact with respect to agency findings of fact derived from documentary evidence). "The Department's conclusions of law are fully reviewable." *Hughes*, 2021 S.D. 31, ¶ 12, 959 N.W.2d at 907.

[¶19.] We review evidentiary rulings under an abuse of discretion standard. *McDowell v. Citibank*, 2007 S.D. 52, ¶ 26, 734 N.W.2d 1, 10 (citing *Behrens v. Wedmore*, 2005 S.D. 79, ¶ 63, 698 N.W.2d 555, 579).

## Analysis and Decision

### 1. *Claimant's work injury was a major contributing cause of her impairment and need for treatment.*

[¶20.] "In a workers' compensation proceeding, the claimant bears the burden of proving the facts 'necessary to qualify for compensation by a preponderance of the evidence.'" *McQuay v. Fischer Furniture*, 2011 S.D. 91, ¶ 11, 808 N.W.2d 107, 111

(quoting *Darling v. W. River Masonry, Inc.*, 2010 S.D. 4, ¶ 11, 777 N.W.2d 363, 367).

SDCL 62-1-1(7) defines "injury," in relevant part, as follows:

> only injury arising out of and in the course of the employment, and does not include a disease in any form except as it results from the injury. An injury is compensable only if it is established by medical evidence, subject to the following conditions:
> . . .
>> (b) If the injury combines with a preexisting disease or condition to prolong disability, impairment, or need for treatment, the condition complained of is compensable if the employment or employment related injury is and remains a major contributing cause of the disability, impairment, or need for treatment[.]

[¶21.] Employer/Insurer does not dispute that Claimant sustained an injury on May 7, 2015, and that the injury occurred within the course and scope of her employment. Therefore, the sole question is whether Claimant's injury remains a major contributing cause of her current condition and the need for surgery and other treatment.

[¶22.] Our decisional law has emphasized that a claimant must show that the work injury is "'a' major contributing cause" of the claimant's condition and the need for treatment. *Orth v. Stoebner & Permann Const., Inc.*, 2006 S.D. 99, ¶ 42, 724 N.W.2d 586, 596 (quoting *Brown v. Douglas Sch. Dist.*, 2002 S.D. 92, ¶ 23, 650 N.W.2d 264, 271). In South Dakota, "insofar as a workers' compensation claimant's 'pre-existing condition is concerned[,] we must take the employee as we find him.'" *Id.* ¶ 48, 724 N.W.2d at 597 (alteration in original) (quoting *St. Luke's Midland Reg'l Med. Ctr. v. Kennedy*, 2002 S.D. 137, ¶ 13, 653 N.W.2d 880, 884).

[¶23.] Employer/Insurer argues that the circuit court and Department misapplied *Armstrong v. Longview Farms, LLP*, 2020 S.D. 1, 938 N.W.2d 425, in

finding that Claimant proved her "work-related injury was and remains a major contributing cause of her condition, need for treatment, and impairment." In *Armstrong*, we affirmed the Department's denial of a claimant's petition for benefits for knee replacement surgery he claimed was necessitated by a recent work injury to his knee. In upholding the Department's decision, we determined that the claimant's preexisting knee condition was worsening well before his work injury, which was just the "tipping point . . . ." *Id.* ¶ 24, 938 N.W.2d at 431. The evidence was uncontroverted that the claimant had been a candidate for knee replacement surgery for over a decade before the injury in question, and "his medical providers noted he was experiencing ongoing, worsening pain in *both knees*." *Id.* The doctor who performed the knee replacement surgery admitted claimant "likely met the diagnostic criteria for [the procedure] years earlier . . . ." *Id.* ¶ 12, 938 N.W.2d at 428. Additionally, in *Armstrong*, the medical imaging of the claimant's knee prior to the work injury showed the same degenerative condition that existed after the injury.

[¶24.] Contrary to Employer/Insurer's assertions, the resolution of the particular facts in *Armstrong* is not determinative of this appeal. Employer/Insurer cites no rule from *Armstrong* that mandates reversal in this case. Rather, it appeals the Department's fact-bound determination that Claimant's 2015 work-related injury was a major contributing cause of her current condition and need for surgery and related treatment. In support of this determination, the Department found that Claimant had significant relief from her prior neck and shoulder injuries after the facet injections in 2009 and that Claimant had been mostly symptom-free

until her 2015 work injury. Moreover, Claimant's 2015 cervical MRI objectively revealed, after her work injury, that the condition of her C5-6 disc had worsened and herniated since her 2009 MRI.[3]

[¶25.] Employer/Insurer also argues that the Department erred in finding that Claimant did not seek care or have significant neck and shoulder issues during the period spanning 2009 to 2015. It highlights Dr. Nipper's deposition testimony that it was not plausible for Claimant to have had no symptoms during this time, based upon her preexisting injuries. Employer/Insurer contends Dr. Nipper's opinion is consistent with the medical records showing that Claimant complained of constant pain in the neck and shoulder areas from 2001 until 2009, received regular, ongoing treatment for these injuries during this time, and was diagnosed with permanent injuries to the neck and shoulder after the 2004 injury. Employer/Insurer also asserts that the loss of her health insurance in 2010 was the only reason that Claimant did not seek treatment for her preexisting injuries during this time.

[¶26.] In administrative appeals, we review de novo an agency's findings of fact that are based upon documentary evidence submitted at the hearing, but we review its findings based on live testimony presented at the hearing for clear error. *See Hughes*, 2021 S.D. 31, ¶ 12, 959 N.W.2d at 907. In reviewing the Department's findings, we note that there is documentation showing that Claimant expressed

---

3. X-rays of the cervical spine taken in February 2004 were not abnormal, and X-rays taken in May 2004 showed moderate encroachment at C5-6. As for the 2009 MRI, Claimant had some minimal disc displacement, including at C5-6, but she had no compressive arthropathy or disease in the joint.

concern about her ability to continue to receive treatment for her prior injuries when her insurance benefits ended in 2009, as well as references in the record at points in time between 2009 and 2015 to Claimant being without health insurance. However, Claimant testified that she received significant relief after the nerve injections in 2009 and was no longer in need of the treatment she was receiving prior to these injections. Claimant also testified that during this timeframe she was refilling her prescription medications and using Flector patches to manage her pain during flare-ups. She further explained that she had no significant ongoing issues until her work injury in 2015. Despite the fact that Claimant sought medical care for other issues between 2009 and 2015, Employer/Insurer presented no evidence that Claimant needed or sought additional treatment for her neck and shoulder during this timeframe. Moreover, there was also evidence that Claimant remained employed full-time, working up to sixty hours per week, and was physically active until her 2015 injury. Finally, Employer/Insurer did not cross-examine Claimant about its theory that she avoided medical treatment for preexisting injuries because of financial reasons.

[¶27.] Further, all three of Claimant's treating physicians found no discrepancy in Claimant's description of the location and mechanism of her injury and agreed her work injury was a major contributing cause of her need for treatment. From our review of the documentary evidence, giving appropriate deference to the Department's ability to observe and consider Claimant's testimony, we conclude that the Department did not clearly err in finding that Claimant did not have significant problems from her prior injuries until the 2015 work injury or

in finding she did not avoid seeking medical treatment for her prior injuries between 2009 and 2015 for financial reasons.

[¶28.]    Employer/Insurer next argues that the Department ignored a material change in Claimant's testimony from her deposition compared to the hearing and that the Department should have rejected Claimant's entire testimony about the neck injury based upon this change.  When asked at deposition where the pain was immediately after the injury, Claimant responded that it was in her right shoulder but did not mention her neck.  At the hearing, when asked where the pain in her shoulder referred to, she mentioned feeling "pressure in my neck.  I wouldn't necessarily call it pain."

[¶29.]    Employer/Insurer also points to Claimant's denial of similar past problems when she filled out an intake form after her 2015 injury.  Dr. Dietrich admitted in his deposition that "she definitely checked that box in a fashion that we would disagree with."  When Employer/Insurer questioned Claimant's credibility concerning this response at the hearing, she explained that the pain was different: "[w]hen I meant no, what I was saying is that similar -- in the past the pain was behind the shoulder to the back side of it.  This was to the front.  That was new."

[¶30.]    Based on these alleged discrepancies, Employer/Insurer argues that Claimant was not credible and that the Department made no credibility determination concerning Claimant's testimony.  It also contends that the Department committed reversible error by failing to reject Claimant's entire testimony consistent with SDCL 62-7-40, which provides that "if the finder of fact determines that any person testifying in the proceeding has knowingly sworn

falsely to any material fact in the proceeding, then the finder of fact may reject all of the testimony of that witness."

[¶31.]       Pursuant to SDCL 62-7-40, a fact finder *may*, but is not required to, reject all the testimony of a witness that it finds has "knowingly sworn falsely to any material fact in the proceeding[.]"  Further, we cannot assume from the absence of a specific credibility determination that the Department found Claimant knowingly swore falsely to a material fact and chose to accept her testimony in spite of that.  The Department could have very well determined that Claimant's testimony at the hearing was not inconsistent with her deposition testimony and that the testimony was consistent with her reports immediately after the injury.  For instance, during Claimant's first visit to Black Hills Health and Wellness Center the day after the injury, she reported neck stiffness and spasms, which provided an objective basis to support her claim of an injury to her neck.

[¶32.]       We recognize the Department's advantage in judging credibility of witnesses and review for clear error.  *See Hughes*, 2021 S.D. 31, ¶ 12, 959 N.W.2d at 907.  "Determining the credibility of the witnesses is the role of the factfinder." *Schneider*, 2001 S.D. 70, ¶ 14, 628 N.W.2d at 730 (citation omitted).  "Due regard shall be given to the opportunity of the agency to judge the credibility of the witness."  *Id.* ¶ 11, 628 N.W.2d at 728–29 (citation omitted); *see Smith v. Stan Houston Equip. Co.*, 2013 S.D. 65, ¶ 17, 836 N.W.2d 647, 652 (deferring to the Department's determination that claimant testified credibly as to his own pain).  The Department's findings demonstrate that its credibility determinations as to

causation were favorable to Claimant, and we find no clear error in these findings by the Department.[4]

## 2.    *Declining to strike Dr. Dietrich's opinion.*

[¶33.]    Employer/Insurer argues that the circuit court erred by upholding the Department's failure to strike Dr. Dietrich's opinions for inadequate foundation, which it asserts was an abuse of discretion.  Claimant initially contends the objection is untimely and therefore waived, citing a Department of Labor decision for the proposition that "[t]he time for objecting to experts was at the Prehearing Conference." *Dennis Pottebaum*, No. 290, 1997/98, 2001 WL 356251, at *1 (S.D. Dept. Lab. Mar. 8, 2001).  Claimant also argues that the Department did not abuse its discretion in declining to strike Dr. Dietrich's opinions based upon inadequate foundation.

[¶34.]    Employer/Insurer asserted foundation objections during Dr. Dietrich's deposition.  Although Employer/Insurer did not raise the foundation objection at the prehearing conference, the foundation objections were already made at the deposition and preserved in the deposition transcript.  Further, Employer/Insurer brought to the Department's attention at the hearing the "objections on the record in that deposition that I want to make sure that are reserved and can be argued as necessary . . . .  And there are a couple of other objections that we're not waiving obviously by having it submitted, so we will maintain those."  The Department

---

4.    Dr. Nipper's deposition testimony also reflects his perception that Claimant answered his questions honestly, that he saw no other doctors in the records question her credibility, and that he agreed with her counsel that he was "not questioning her credibility here today[.]"

expressed understanding and "[w]ith that noted" admitted the deposition into evidence. Rather than deeming the objection waived, the Department overruled it on the merits: "[f]or the sake of expedience, the Department will address the objection that was made during deposition."

[¶35.] We have held "that an objection first formally made . . . after a hearing does not preserve such objection for appeal. Having acquiesced in the admission of the challenged materials at the hearing, [parties] are estopped to object before an appellate court." *Application of Am. State Bank, Pierre*, 254 N.W.2d 151, 155 (S.D. 1977) (internal citations omitted). But here, at the hearing, Employer/Insurer sought confirmation that the Department was aware of the formal objection to foundation it had made during the deposition. Although it did not elaborate on its objections at the prehearing conference or the hearing, the objections were preserved, counsel for Employer/Insurer noted it was not waiving these objections, and the Department specifically addressed and overruled the foundation objections. Therefore, the foundation objection was adequately preserved.

[¶36.] Reaching the merits, the Department applied the *Burley* test in determining Dr. Dietrich's testimony was relevant and had adequate foundation:

> Admissibility of expert testimony is governed by SDCL 19-15-2 (Rule 702). Under this rule, before a witness can testify as an expert, that witness must be "qualified." *Id.* Furthermore, "[u]nder *Daubert*, the proponent offering expert testimony must show that the expert's theory or method qualifies as scientific, technical, or specialized knowledge" as required under rule 702. *State v. Guthrie*, 2001 S.D. 61, ¶ 34, 627 N.W.2d 401, 415–416; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799, 125 L. Ed. 2d 469 (1993). Before admitting expert testimony, a court must first determine that such qualified testimony is relevant and based on a reliable foundation. *Guthrie*, 2001 S.D. 61, ¶ 32, 627 N.W.2d at 415.

> The burden of demonstrating that the testimony is competent, relevant, and reliable rests with the proponent of the testimony. SDCL 19-9-7 (Rule 104(a)). The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10, 113 S. Ct. at 2796 n.10, 125 L. Ed. 2d 469 n.10. "Relevance embraces 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Guthrie*, 2001 S.D. 61, ¶ 32, 627 N.W.2d at 415 (quoting SDCL 19-12-1).

*Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 13, 737 N.W.2d 397, 402–03 (alteration in original).

[¶37.] Dr. Dietrich personally treated Claimant and was aware of her preexisting injuries from a review of records from Dr. Lawlor, ProMotion, and Black Hills Orthopedic as well as the summary of Claimant's medical records. His curriculum vitae included his medical degrees, residencies, licenses, certifications, and relevant experience. His testimony had a tendency to make the existence of facts of consequence to the determination of the action more or less probable than without his testimony. Once Claimant showed his "testimony rest[ed] upon 'good grounds, based on what is known[,]'" *id.* ¶ 24, 2007 S.D. 82, 737 N.W.2d at 406 (citation omitted), "[a]ny other deficiencies in [his] opinion . . . [could] be tested through the adversary process at trial." *Id.*

[¶38.] Employer/Insurer notes, however, that Dr. Dietrich formed his opinion based on a summary of Claimant's medical records prepared by her counsel rather than by reviewing Claimant's full medical records. It cites *McQuay,* a prior decision by this Court in which Dr. Dietrich testified and the court upheld a finding by the Department that his opinions were less persuasive than that of a non-treating expert. 2011 S.D. 91, ¶ 25, 808 N.W.2d at 113. In support of its evidentiary

objection, Employer/Insurer argues that "[i]t is impossible for Dr. Dietrich to have a sufficient understanding of Claimant's prior injuries, treatments, and diagnoses without reviewing the actual and complete records." But here, while Employer/Insurer asks this Court to accept that "[s]urely more is required of an expert[,]" *McQuay* does not provide the broad "actual and complete records" requirement it reads into it when considering the admissibility of expert testimony. The Court's statements in *McQuay* related to the weight afforded to Dr. Dietrich's opinion, on de novo review, not the admissibility of his opinions. Contrary to Employer/Insurer's assertion, *McQuay* did not hold that experts, as a matter of course, are required to consider all of a claimant's medical records to establish an adequate foundation for their opinions.

[¶39.]     The circuit court found no abuse of discretion in the Department's admission of Dr. Dietrich's testimony, and neither do we. Dr. Dietrich was aware of Claimant's prior accidents and treatment, and these preexisting injuries were thoroughly explored by Employer/Insurer's counsel during cross-examination of Dr. Dietrich. Employer/Insurer's objections go to the weight rather than the admissibility of his testimony. *See State ex rel Dep't of Transp. v. Spiry*, 1996 S.D. 14, ¶ 16, 543 N.W.2d 260, 263–64 ("Regardless of the timeliness of the objection, however, it appears clear to the Court that the [party's] objection is without merit. The basis of an expert's opinion is generally a matter going to the weight of the testimony rather than the admissibility.").

### 3. *Persuasiveness of expert opinions.*

[¶40.]    Employer/Insurer also argues that the circuit court erred by finding Claimant's experts' opinions more persuasive than Dr. Nipper's. Employer/Insurer cites numerous cases where this Court found non-treating expert testimony more persuasive than that of their counterparts who had treated the claimants. It also cites *McQuay* in support of its claim that Dr. Dietrich's opinion, in this case, should be determined less persuasive than that of Dr. Nipper. *See* 2011 S.D. 91, ¶ 25, 808 N.W.2d at 113.

[¶41.]    The Department and the circuit court expressly acknowledged the possibility that a non-treating expert could be more persuasive than a treating expert. Nevertheless, both found the treating experts more persuasive in this case, particularly in light of the Department's findings that Claimant was active and did not have any significant neck and shoulder injuries for six years before her 2015 work injury. Further, Employer/Insurer does not advance a legal argument supporting its contention of error. Instead, it argues that Dr. Nipper had a more exhaustive understanding of Claimant's medical history than the treating physicians, but it cites no authority requiring such a standard be met. Having affirmed the Department's findings concerning Claimant's testimony under clear error review, we find no error in the Department's findings concerning the medical opinion testimony or causation.

[¶42.]    Affirmed.

[¶43.]    KERN, SALTER, DEVANEY, and MYREN, Justices, concur.